2020 IL App (2d) 170900
No. 2-17-0900
Opinion filed November 12, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-44 |
| SHANE LEWIS, | ) ) ) | Honorable Linda S. Abrahamson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Jorgensen and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Shane Lewis, was charged by indictment with involuntary sexual servitude of

a minor (720 ILCS 5/10-9(c)(2) (West 2014)), traveling to meet a minor (*id.* § 11-26(a)), and

grooming (*id.* § 11-25(a)). At a jury trial, defendant asserted the defense of entrapment. The jury

found defendant guilty of the charged offenses. On appeal, he argues that (1) in presenting the

affirmative defense of entrapment, defense counsel rendered ineffective assistance of counsel for

failing to (a) provide a definition for "predisposed" when requested by the jury, instead

acquiescing in the court's decision not to answer the question, (b) present to the jury that defendant

had no criminal record, and (c) object to the State's mischaracterization of the entrapment defense

during closing argument; (2) the State failed to prove beyond a reasonable doubt that he was not

entrapped into committing the offenses; (3) the State failed to prove that defendant was guilty of involuntary sexual servitude of a minor where the statute applies to sex traffickers but not to patrons like him, there was no minor involved, and, alternatively, no minor was threatened or coerced; and (4) defendant's conviction and sentence for involuntary sexual servitude of a minor must be vacated because the statute violated the proportionate penalties clause of the Illinois Constitution. Based on defense counsel's ineffective assistance, we reverse defendant's convictions and remand for a new trial. Because this issue is dispositive, we do not address the remaining issues on appeal.

¶ 2                                    I. BACKGROUND

¶ 3      Before trial, defendant, claiming that no actual minor was involved in the alleged offense, filed a motion to dismiss the charge of involuntary sexual servitude of a minor. Defendant also argued that the statute was unconstitutional because the Class X felony offense of involuntary sexual servitude of a minor contained identical elements to the Class A misdemeanor offense of attempted patronizing a minor engaged in prostitution. Noting that the State may no longer criminally prosecute juvenile prostitutes, the trial court concluded that attempted patronizing a minor engaged in prostitution could not be a comparable offense.   The court therefore denied defendant's motion. Defendant filed a motion to reconsider. The court expressed its opinion that patronizing a minor engaged in prostitution should no longer be "on the books." The court also found that the same criminal behavior can result in different penalties without offending the proportionate penalties clause. The court denied the motion to reconsider except as to the issue of the absence of actual minors. The court stated that it would decide that issue when the parties discussed the jury instructions. The court ultimately denied that aspect of the motion as well.

¶ 4     The trial commenced on July 31, 2017, during which the following relevant evidence was presented. On January 8, 2015, defendant responded by text to the phone number listed in an advertisement for a female prostitute on the website "Backpage.com." The ad was titled "young warm and ready :)—18." It highlighted a photograph of a brunette female wearing cut-off jean shorts and a midriff-baring top. The female's face could not be seen. The advertisement read as follows:

> "Its ssooooooo cold outside, come warm up with a hot little coed. Im young, eager to please and more than willing to meet all your desires. come keep me warm and I promise to return the favor: 0:):) ask about my two for one special text me at [xxx-xxx-xxxx].
>
> 100 donation for hh
>
> 150 donation full hour
>
> Poster's age: 18"

Defendant was not aware when responding to the ad that he was communicating with Agent Spencer Taub of the United States Department of Homeland Security (DHS). The following is the text exchange that occurred between the two:

> "[DEFENDANT]: Hey looking to get warm
>
> [TAUB]: hey—my girls could use some warming up 2 ;)
>
> [DEFENDANT]: What's up with 2 girl. I only see pic of one?
>
> [TAUB]: no can't post pix of my daughters, 2 risky
>
> [DEFENDANT]: HaHa. Well what's the 2 girl special? And do u serve downers grove
>
> [TAUB]: no we r in aurora. infall only

[DEFENDANT]: Well it's not to far from me but to come out in this weather I would have to know what they look like. U don't have to post a pic. U can text some

[TAUB]: 200 for 2 grls

[DEFENDANT]: That's fine but I need to know what they look like

[TAUB]: the 14 yrs is blond and 15 yrs is brunet—both r in sports

[DEFENDANT]: wtf?? Not interested in minors. You crazy?

[DEFENDANT]: I'm 32

[DEFENDANT]: 18 is good but nothing under that too risky!!

[TAUB]: as long as u r gentle and treat my girls good

[TAUB]: I'm here to protect my grls

[DEFENDANT]: Are you a female?

[DEFENDANT]: Are u affiliated with the law or something?

[TAUB]: yes

[DEFENDANT]: Yes your with the law

[TAUB]: ummm… no… r u?

[DEFENDANT]: No.

[DEFENDANT]: Are u affiliated with the law. I want to make this question clear. Please answer in your next text

[DEFENDANT]: I am not!!

[DEFENDANT]: What if I just see u. Since your above 18

[TAUB]: no—wat r u talking about? r u a cop? Ur txt sounds like u r

[DEFENDANT]: No im not! But why wud u advertise their age when u know that's illegal under 18.

[TAUB]: I said yes to being a female—u txt way 2 fast

[DEFENDANT]: Haha sorry for fast text.

[TAUB]: because I don't want fricken cops at my f*** door

[DEFENDANT]: I think naturally they are old enough but the law says they are not.

[TAUB]: i do 2—my girls want 2 do this

[DEFENDANT]: Send me a pic

[TAUB]: i won't put them into sum thing they don't wann do

[DEFENDANT]: Ok where u at

[TAUB]: haha my txts are cumin in so f*** up

[TAUB]: im in aurora

[DEFENDANT]: Where you at. I'll come only if your there watching

[DEFENDANT]: I know aurora. Where at?

[TAUB]: yea—i'll watch—u b 2 ruf on my girls i'll kick ur a***.

[TAUB]: which one u want? 14 yr or 15, or both? Both is 200?

[DEFENDANT]: What about u how much for u

[TAUB]: not a ? both is 200

[DEFENDANT]: How much for all 3 of u

[TAUB]: I'm not in hun

[DEFENDANT]: U sure this is safe?

[DEFENDANT]: Ok tell me where to come

[TAUB]: what u want?

[DEFENDANT]: Both

[TAUB]: k 14 yr old is shy- so b gentl. No anal, must wear condom

[DEFENDANT]: No anal for sure and condom yes

[DEFENDANT]: If she doesn't want to she doesn't have to

[TAUB]: ok 88 and orchard

[DEFENDANT]: Hotel?

[TAUB]: i appreciate that. so just sex? if something else let me tell her

[TAUB]: yes hotel

[DEFENDANT]: On my way

¶ 5    Defendant entered the hotel room and met Melissa Siffermann, a special agent with DHS, posing as the mother offering her two daughters for sex. Defendant provided $200 in cash, which he left on the nightstand next to the bed. After they conversed for several minutes, defendant was arrested.

¶ 6    The court admitted into evidence a video recording of the conversation between Siffermann and defendant. As an aid, the State provided a transcript of the recording to the jury as they watched the video. During that conversation, defendant admitted that he was nervous about the age of the girls. He mentioned that he just "wanna get shizzed," to which Siffermann responded: "I just want to make sure that [there was] no anal." Defendant told her that he really did not have much of a plan, that he was "just kind of curious and nervous at the same time but um, *** we can show them the way." Defendant continued that "[t]his makes me nervous just saying their ages, like why don't you just tell me they are eighteen and nineteen please." "I mean like naturally I think that you know, once a girl has her period she's ready for that kind of thing but *** legally, obviously *** it's not the right thing."

¶ 7    Geoffrey Howard, a special agent with DHS, testified that his department entered into a partnership with the Aurora Police Department as part of an ongoing sting operation called "Child Shield" to target individuals who were seeking to have sex with minors. On January 8, 2015, an ad was posted on an escort service webpage called "Backpage.com." The ad provided a phone number to which interested individuals could sent a text. In order to keep the high volume of messages straight, the officers used a computer system called Callyo, which allowed them to respond to incoming texts via computer rather than phone. The program created a record of incoming and outgoing messages.

¶ 8    Howard recalled that there had been a snowstorm on January 8, 2015, and it was very cold, with high winds and blowing snow. On that night, Howard arranged a set up at a hotel off Orchard Road and I-88 in Aurora. He chose that hotel primarily because of its proximity to the interstate and to the Chicago area in general.

¶ 9    Howard explained how he set up the sting operation at the hotel. The agents conducted the operation out of two adjoining rooms. One room, called the "target room," was used as a meeting room for the targeted individuals and the undercover officer who played the "mother." The other room was used as the control room where several officers would correspond by text messages with individuals responding to the online ad. Two surveillance cameras were set up. One camera recorded the hallway outside of the meeting room. The other camera recorded the inside of the meeting room. Several agents monitored the surveillance equipment.

¶ 10    Investigator Erik Swastek of the Aurora Police Department testified that he posted the ad in the adult section of Backpage.com on January 8, 2015. He stated that, if an ad included someone younger than 18, the ad would not post. However, based on what he learned from a prostitute, people trying to find juveniles on Backpage.com looked for people posing as 18- or 19-year-olds.

¶ 11   Swastek stated that the phone number used was a "spoof" number. After someone responded to the ad, Swastek assigned the number to an officer who would then be responsible for communicating with that person. At approximately 10:02 p.m., on January 8, 2015, a text message was received in response to the ad, which Swastek assigned to Taub. On that particular day, Swastek remembered that "it was a snowy, cold, miserable day."

¶ 12   Taub testified that he was assigned to respond to the texts coming in from defendant that night. He portrayed the role of a mother offering her daughters for sexual services. All the texters were given the same instructions. Taub testified to the contents of the text conversation with defendant. Taub explained that the word "infall" was a typo for the word "incall," which meant you had to come to the hotel for sexual services. The last text occurred around 11:16. p.m. when defendant arrived at the hotel parking lot and Taub texted him the room number.

¶ 13   Siffermann testified that she portrayed the mother who offered her two teenage daughters for sex on the night in question. She was aware that someone responded to the ad and would be arriving at the meeting room. At approximately 11:19 p.m., defendant entered, they began talking, and he gave her $200. The conversation lasted a few minutes, ending with defendant expecting Siffermann's daughters to arrive in the room and Siffermann excusing herself to the bathroom. After she entered the bathroom, the arrest team entered the room and arrested defendant.

¶ 14   Siffermann testified that during the conversation defendant used the term "shizzed." In the context of her experience with sex trafficking and prostitution operations, she described it to mean a person who climaxes so intensely as to defecate on oneself.

¶ 15   Following his arrest, police found a cell phone, a box of condoms, and $400 in defendant's pocket. Nothing incriminating was found on defendant's cell phone or iPad beyond the text messages admitted at trial.

¶ 16 Defendant signed a waiver of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Aurora police officer Greg Christoffel, who interviewed defendant, recalled that defendant told him that he in was in town on business when he decided to go on an adult website because he was lonely. He received a text message from someone he believed to be the mother of a 14- and a 15-year-old, who stated that they were available for sex. Defendant thought the ages were a typo but responded out of "curiosity," even though he had no intention of having sex with a 14- or 15-year-old.

¶ 17 Defendant called several character witnesses on his behalf. Kevin Carlson testified that he had known defendant for more than 10 years and that they had worked together for 8 years. Defendant was his "best friend" and a "great mentor." They went to bars together, but they never picked up women. Carlson lived with defendant and his wife for two years. Carlson stated that defendant "never, ever talked about underage girls before."

¶ 18 Alan Kaper testified that he had worked with defendant and that they had been friends for 13 years. They attended charity events, football games, and had gone on vacation together several times. Occasionally, they discussed their sex lives, but they did not pick up women together. Kaper stated that defendant "absolutely has never shown any want to be with an underage person."

¶ 19 Defendant's sister, Krista Jackson, testified that she had a close relationship with her brother. She testified that he would "never" have sex with an underage girl and that she had never seen him display any inclination, predisposition, or interest in underage girls.

¶ 20 Defendant's 23-year-old niece, Tanisha Lewis, testified that she was very close with her uncle. She stated that she lived with him for a while and that he had no predisposition or interest in having sex with underage girls.

¶ 21     Defendant testified that he lived in Pennsylvania and had been married for 14 years. On January 8, 2015, he was 35 years old and was in town on business and staying in a hotel in Downers Grove. At that time, he had been separated from his wife for nearly six months. Defendant finished work at about 8:45 p.m. As he sat in the hotel parking lot in Downers Grove, he started searching through Backpage.com because he was depressed, lonely, and looking for companionship. He had been on the site before, after a business traveler he had met a few weeks earlier told him about it. Defendant stated that he was not looking for sex, but shortly after he started texting with Taub, it became apparent to him that "there was a sexual agenda there." Defendant stated that, when one clicks on the ad, there is an indication that you must agree that this is an adult site only. When he responded to the ad that said, "my girls just want to get warm," defendant had no idea that there were minors involved. At some point when the texter mentioned her daughters were minors, defendant said, "Wtf, I'm not interested in that. Are you crazy?"

¶ 22     Defendant acknowledged texting that he knew that girls aged 14 and 15 were old enough to have sex "but the law says they are not." Defendant meant that girls can get pregnant at those ages and thus are "capable." Defendant did not believe that it is "okay to have sex with girls that age." Defendant stated that his memory was somewhat "foggy" about that night, and he hardly could believe that he texted those words. Once he arrived at the hotel, he thought it was okay because the mother was there. Defendant explained that, because the "mom" kept talking and trying to get him to agree to the transaction, it made him feel comfortable.

¶ 23     During cross-examination, defendant testified that it was not his goal that night to have sex with a 14- and a 15-year-old. Defendant explained that the business traveler who recommended the site told him that the adult services had a variety of amenities, including people who would go out with you for dinner and "cuddle" with you. Defendant testified that he asked how much for all

three, the mother and the two teens, because he was politely trying to divert the conversation back to the texter. Defendant believed that, from the initial contact, there was a sexual agenda, so he stopped to buy condoms at a gas station on the way. Defendant denied using the word shizzed, and he claimed that it was not clear from the video that he used the word.

¶ 24 The trial court ruled that defendant could present an entrapment defense and provided defendant's Illinois Pattern Jury Instruction, Criminal, No. 24-25.04 (4th ed. 2000) (hereinafter IPI Criminal 4th) concerning entrapment to the jury. The instruction provided that a defendant was entrapped if he was "incited or induced by a public offender to commit [the] offense," unless he was "predisposed to commit the offense[.]" During its deliberations, the jury sent a written question to the court that read, "Legal definition of incited and induced and predisposed." The prosecutor informed the court that he recalled reading a case holding that defense counsel was not ineffective for agreeing not to provide definitions for those same terms. The prosecutor was concerned that there were no legal definitions, to which the court responded that there are and that "[y]ou can look it up in Black's. That's the legal dictionary. So there is one in there, but I don't want to go down that path. There's no IPI on it." Defense counsel responded that he was fine with that and agreed with the court responding to the jury: "You have all of your instructions, please continue to deliberate." Just over thirty minutes later, the jury again asked, "Predisposition—what does this mean—please give definition[.]" The following colloquy then took place:

"MS. GLEASON [(ASSISTANT STATE'S ATTORNEY)]: I thought—didn't they ask that the last time?

THE COURT: I think that as induce, incite or—was that the third thing?

MS. GLEASON: That's what I wrote down, but I could be wrong.

MR. ZUELKE [(DEFENSE COUNSEL)]: I got that you said predisposed.

THE COURT: Whatever it is. And if you guys were writing down what I said last time, 'you have all your instructions. Please continue to deliberate.' Is that what I said?

MR. ZUELKE: Yes.

MS. GLEASON: I had, 'You have all of the instructions. Please continue to deliberate.'

THE COURT: All right. 'You have all of the instructions. Please continue to deliberate.'

And now that they have had a chance to digest the answers to the other, so just maybe stand by for a minute or two just in case because that buzzer went off really fast."

¶ 25    The discussion apparently was interrupted by the jury announcing that it had reached a verdict. The jury found defendant guilty of all three offenses. Defendant filed a motion for a new trial, claiming, *inter alia*, that he could not have knowingly committed the offense of involuntary servitude where there was no actual minor involved and that the statute defining the offense violated the proportionate penalties clause of the Illinois Constitution. The court denied the motion.

¶ 26    Following a sentencing hearing, the trial court sentenced defendant to six years' imprisonment on his conviction of involuntary sexual servitude of a minor and to two years on his conviction of traveling to meet a minor, to run concurrently. The grooming conviction merged into the conviction of traveling to meet a minor. Defendant timely appeals.

¶ 27                                    II. ANALYSIS

¶ 28    Defendant contends that his trial counsel rendered ineffective assistance of counsel by (1) failing to provide a definition for "predisposed" when requested by the jury, instead acquiescing in the court's decision not to answer the question, (2) failing to present to the jury that

he had no prior criminal history as it related to the question of predisposition, and (3) failing to object to several aspects of the State's closing argument regarding entrapment.

¶ 29    To establish ineffective assistance of counsel, a defendant must show both (1) deficient performance by counsel that fell below an objective standard of reasonableness and (2) prejudice, meaning a reasonable probability that absent counsel's error, the result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the first prong of the *Strickland* test, defendant must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Id.* at 689. Under *Strickland*'s prejudice prong, a "reasonable probability" that the result would be different is a probability that is sufficient to undermine confidence in the outcome of the trial. *People v. Houston*, 229 Ill. 2d 1, 4 (2008). The failure to satisfy either of the *Strickland* prongs dooms the claim. *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 30    Defendant argues that the individual and cumulative effect of his counsel's deficient performance prejudiced the jury and deprived him of a fair trial. We first address the three ineffectiveness claims individually to determine if there was deficient performance. We then consider whether, cumulatively, any such deficiencies prejudiced defendant such that confidence in the trial's outcome has been undermined.

¶ 31                    A. Deficient Performance

¶ 32                    1. Failure to Submit Definition of "[P]redisposed"

¶ 33    Initially, defendant argues that trial counsel was ineffective where he failed to offer a definition of "predisposed," instead acquiescing in the court's decision to instruct the jurors, "You

have all your instructions, please continue to deliberate." Defendant asserts that this was deficient performance because the common understanding of the term "predisposed" is at odds with the more narrowly focused understanding of the term for purposes of the entrapment defense. Because defendant, in claiming entrapment, admitted committing the elements of the charged offenses, the issue of his predisposition was the lynchpin of his defense, and the jury should not have been allowed to labor under a misunderstanding of that concept.

¶ 34     The State counters that it was not deficient performance to acquiesce in the decision not to answer the jury's questions. The State cites *People v. Sanchez*, 388 Ill. App. 3d 467 (2009), where the First District held that defense counsel was not ineffective for acquiescing in the trial court's decision not to provide a requested definition for "predisposed" in an entrapment case. The *Sanchez* court noted, "[w]hen words in a jury instruction have a commonly understood meaning, the court need not define them with additional instructions. [Citation.] This is especially true where the pattern jury instructions do not provide that an additional definition is necessary." *Id.* at 477-78. For the reasons that follow, we decline to follow our sister court's analysis in *Sanchez*.

¶ 35     In this case, the jury was instructed with the IPI Criminal 4th instruction regarding the affirmative defense of entrapment, which states:

> "It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant, he was incited or induced by a public officer to commit an offense.
>
> However, the defendant was not entrapped if he was predisposed to commit the offense and a public officer merely afforded to the defendant the opportunity or facility for committing an offense." IPI Criminal 4th No. 24-25.04.

During deliberations, the jury asked the trial court for the legal definition of "predisposed," which, with the acquiescence of defense counsel, was not provided. The jury subsequently asked for the definition of "predisposition," but as the judge and the parties discussed the response, the jury apparently reached its verdict and the question was not further addressed.

¶ 36    "[T]he general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). "This is true even though the jury was properly instructed originally." *Id.* at 229.

¶ 37    Here, the concern raised by defendant is that the commonly understood meaning of "predisposed" is broader than how the concept is understood in the governing case law for purposes of the entrapment defense. "Predisposition," as understood in the entrapment context, focuses on the defendant's *mens rea* before the exposure to government agents: " '[P]redisposition is established by proof that the defendant was ready and willing to commit the crime without persuasion *and before his or her initial exposure to government agents*.' " (Emphasis added.) *People v. Bonner*, 385 Ill. App. 3d 141, 146 (2008) (quoting *People v. Criss*, 307 Ill. App. 3d 888, 897 (1999)); see also *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 38; *Sanchez*, 388 Ill. App. 3d at 474. Webster's Third New International Dictionary defines "predisposed" as "having a predisposition." Webster's Third New International Dictionary, 1786 (1993). Black's Law Dictionary defines "predisposition" as "[a] person's inclination to engage in a particular activity." Black's Law Dictionary 1216 (8th ed. 2004).

¶ 38    Accepting that the common understanding of "predisposed" mirrors the above dictionary definitions rather than the narrower understanding in our governing case law, the defendant's problem is readily apparent. The common understanding does not focus the jury on the correct

timeframe for its predisposition analysis, *i.e.*, before defendant's initial exposure to government agents. See *Bonner*, 385 Ill. App. 3d at 146-47. Accordingly, the failure to properly define predisposition potentially allowed the jury to find that defendant was predisposed to commit the offenses by focusing on the wrong timeframe, *e.g.*, the time he entered the hotel room—a far easier point from which to find predisposition than from the time before defendant's exposure to the government agents.[1]

¶ 39    To ensure that the jury properly understood the concept of predisposition despite having twice expressed confusion about it, the trial court should have answered the jury's question with reference to the readily available explanation of predisposition set forth in *Bonner*. *Bonner*, 385 Ill. App. 3d at 146. Of course, we must acknowledge that the court's failure to provide the *Bonner* definition cannot be said to be error in the traditional sense, insofar as defense counsel acquiesced in the court's decision not to answer the question and defendant does not assert plain error on appeal. This acquiescence, however, and the failure to provide the *Bonner* definition to the court,

---

[1] Though neither of the parties cite the legislative history of the entrapment statute, we note, parenthetically, a discussion on the House floor between the sponsor of the 1996 amendment to the statute and another member wherein they agreed that the dictionary definition of predisposition would apply in lieu of defining the term in the statute. See 89th Ill. Gen. Assem., House Proceedings, March 22, 1995, at 108 (statements of Representatives Durkin and Hoffman); Pub. Act 89-332, § 5 (eff. Jan. 1, 1996) (amending 720 ILCS 5/7-12). We do not, however, find this discussion in any way determinative of our current analysis. The issue is not the dictionary definition itself but rather where to focus the dictionary definition for purposes of the entrapment analysis, *i.e.*, prior to exposure to government agents.

was deficient performance on the part of trial counsel, given that lack of predisposition was the lynchpin of the defense. Given the difference between the common understanding of "predisposition" and its narrower meaning in the entrapment context as set forth above—a distinction that the *Sanchez* court did not address—we decline to follow the holding in *Sanchez* that it was not ineffective assistance of counsel to acquiesce in the decision to decline the jury's request for the definition of predisposition. *Sanchez*, 388 Ill. App. 3d at 477-78.

¶ 40    Simply put, there is no strategic basis for allowing a confused jury to potentially stray from the proper timeframe—the time before defendant's exposure to government agents—in deciding whether defendant was predisposed to commit the offenses he otherwise admitted committing. Allowing the jury that leeway was deficient performance as it relates to the entrapment defense.

¶ 41         2. Failure to Present Evidence of Defendant's Lack of Prior Criminal Record

¶ 42    Defendant further contends that his trial counsel rendered deficient performance by failing to present to the jury the material fact that he had no criminal record, which was relevant to whether he was predisposed to commit the charged offenses before exposure to law enforcement.

¶ 43    A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). Lack of a criminal record is relevant to an entrapment defense because it tends to show that the defendant was less likely to be predisposed to commit the charged offense. *Ramirez*, 2012 IL App (1st) 093504, ¶ 43; see also *Criss*, 307 Ill. App. 3d at 899 (trial court erred in excluding evidence of defendant's lack of criminal record in entrapment case).

¶ 44    Defendant had no criminal background at all, but his counsel did not present that fact to the jury. A defendant raising the defense of entrapment must admit to the factfinder that he has committed the charged offense, while urging that he lacked the predisposition to commit the

offense. See *Ramirez*, 2012 IL App (1st) 093504, ¶ 28. Informing the jury that defendant had no criminal history, including no previous criminal convictions involving sexual conduct with minors, would have bolstered defendant's argument to the jury that he was not predisposed to commit the offenses before exposure to government agents. Defendant's lack of a criminal record was strong evidence demonstrating this lack of predisposition, and counsel's failure to present this evidence is an obvious failure to function as the counsel guaranteed by the sixth amendment.

¶ 45                    3. Failure to Object to the State's Entrapment Argument

¶ 46    Defendant finally contends that counsel performed deficiently by failing to object to the State's closing argument as it related to both inducement and predisposition. During closing, the prosecutor told the jury, "[i]f you find that the police did incite or induce him, then you can look at the next step," which was predisposition. Defendant argues that this two-step articulation improperly suggested to the jury that it had to first find inducement before considering the predisposition issue. This articulation ignores that it became the State's burden to disprove inducement, or prove predisposition, beyond a reasonable doubt once the trial court decided there was sufficient evidence to allow the affirmative defense of entrapment. *Bonner*, 385 Ill. App. 3d at 145. The State counters that it has wide latitude in closing argument and that its argument appropriately mirrored the IPI Criminal 4th entrapment instruction.

¶ 47    Defendant correctly construes the State's argument as shifting the burden. Once the trial court finds sufficient evidence to warrant allowing defendant to submit the affirmative defense of entrapment to the jury, it is the State's burden to defeat the defense by proving beyond a reasonable doubt either (1) that defendant was not induced or (2) that he was predisposed to commit the offense before his exposure to government agents. To suggest that the jury had to first determine that defendant was induced misallocates the burden. The jury did not have to "find inducement"

for defendant's entrapment instruction to prevail; rather, the State had to disprove that defendant was entrapped beyond a reasonable doubt. *Ramirez*, 2012 Il App (1st) 093504, ¶ 28.

¶ 48 Defendant further argues that his counsel was deficient for failing to object to the prosecutor's predisposition argument that, "what we have to prove is that [defendant] was willing to do this and the opportunity was there." We agree with defendant that the State was required to prove beyond a reasonable doubt that defendant was willing to commit the crime without persuasion and before his initial exposure to government agents. *Bonner*, 385 Ill. App. 3d at 145; *Ramirez*, 2012 IL App (1st) 093504, ¶ 38; *Sanchez*, 388 Ill. App. 3d at 474. For the reasons we articulated (*supra* ¶ 37-39) regarding the definition of predisposition, trial counsel should have objected to any argument that failed to pinpoint the proper timeframe for the predisposition analysis.

¶ 49 We find that counsel unreasonably failed to object to the mischaracterization of the burden of proof and to an improperly broad articulation of predisposition.

¶ 50 B. Prejudice

¶ 51 Having identified the above deficiencies in trial counsel's performance, all of which relate in some fashion to the question of defendant's predisposition to commit the offenses, it remains to determine whether defendant was prejudiced such that there was ineffective assistance of counsel. See *Houston*, 229 Ill. 2d at 4. Defendant urges that the predisposition question was the lynchpin of his defense and so the jury's obvious confusion as to the meaning of predisposition undermines confidence in the outcome of the trial.

¶ 52 The State counters that there was no prejudice, because the evidence demonstrates beyond a reasonable doubt that defendant was not induced and, in the alternative, that defendant was predisposed to commit the admitted-to offenses.

¶ 53    A defendant raising entrapment must present at least slight evidence that (1) the State induced or incited him to commit the crime and (2) he was not otherwise predisposed to do so. *People v. Placek*, 184 Ill. 2d 370, 380-81 (1998). Once the defendant presents slight evidence of entrapment, and the trial court allows the affirmative defense, the burden shifts to the State to rebut the entrapment defense beyond a reasonable doubt. *Bonner*, 384 Ill. App. 3d at 145. Here, defendant presented enough evidence to warrant allowing him to pursue the affirmative defense of entrapment. Regarding inducement, Taub was the first person to bring up the possibility of sex with minors and persisted in pursuing that option with defendant even after he expressed that he was not interested. Regarding predisposition, defendant and his witnesses testified to defendant's lack of sexual interest in minors.

¶ 54    Arguing that defendant was not induced, the State invites us to engage in a bifurcated prejudice analysis that first considers the question of inducement. It argues that because the evidence showed that defendant was not induced beyond a reasonable doubt, it proved that defendant was not entrapped, rendering any deficient performance on the predisposition issue nonprejudicial.

¶ 55    While the question of entrapment is generally one for the jury to decide (*Placek*, 184 Ill. 2d at 381), we cannot say with any certainty that the State proved beyond a reasonable doubt that defendant was not induced. On the one hand, Taub was the first to mention sex with minors to defendant, and Taub continued to suggest the conduct after defendant initially expressed disinterest. On the other hand, defendant quickly overcame his expressed disinterest in sex with minors and proceeded to plan a sexual encounter with the minors whom Taub described, ultimately traveling in a snowstorm to accomplish this purpose. Further, any meaningful attempt to parse through the evidence to decide the inducement prong was irreparably thwarted by the State's

argument to the jury that it first had to find inducement before reaching the predisposition question. This argument implicitly shifted the burden to the defense to disprove entrapment. The two-step process that the State proposed to the jury raises serious concerns about how the jury approached the entrapment defense.

¶ 56     Therefore, we reject the State's suggestion that its evidence on inducement dispenses with our need to determine prejudice. We note that, although inducement and prejudice are distinct elements of the entrapment defense, they are very much interrelated. Inducement focuses on the government's actions, whereas predisposition "focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (quoting *Sherman v. United States*, 356 U.S. 369, 372 (1958)). The two inquiries are often closely linked because the need for greater inducement may suggest that the defendant was not predisposed to commit the crime, while, conversely, a ready response to minimal inducement may indicate predisposition.

¶ 57     Next, we consider whether the failure to offer a readily available definition of predisposition was prejudicial to defendant. The refusal to clarify the jury's confusion over the meaning of "predisposition" created a serious danger that the jury convicted defendant based upon a consideration of predisposition untethered from the relevant timeframe, *i.e.*, prior to his exposure to government agents. For example, it is entirely feasible that the jury considered the predisposition question focused on the timeframe when defendant arrived at the hotel, condoms and cash in hand—a timeframe whereby it would be much easier to conclude defendant was predisposed to commit the offenses.

¶ 58     Of course, the effect of the State's burden-shifting inducement argument and the jury's confusion over predisposition was further compounded by defense counsel's failure to inform the

jury that defendant had no criminal history—a fact that would have bolstered the argument that defendant was not predisposed to commit the offenses before his exposure to government agents. The State argues that defendant was not prejudiced by this, because character witnesses testified that defendant never showed any sexual interest or inclination toward minors. We, however, agree with defendant. The jury might have thought that, since these witnesses were defendant's family and friends, they were biased or simply unaware of defendant's sexual interest in minors—an interest which defendant presumably would keep secret from them. Conversely, defendant's lack of a criminal record would have been objective evidence that defendant was not predisposed to commit the offenses before his exposure to law enforcement.

¶ 59    During closing argument, the State told the jurors that the instructions contained "a lot of legal words *** that [p]robably a good contract attorney *** might be able to figure out what they all are." While we find this characterization of the instructions unfortunate in that it suggested to the jurors that the salient terms might be beyond their understanding, there is no question that both the failure to define predisposition to the jury and the State's burden-shifting explanation of inducement certainly muddied the waters. *Strickland*'s prejudice prong is not simply an "outcome-determinative" test but may be satisfied if the defendant demonstrates that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). Here, the cumulative effect of counsel's deficient performance rendered the proceeding unreliable under *Strickland*. Therefore, we reverse defendant's convictions and remand the matter to the trial court for a new trial.

¶ 60    Since we reverse and remand, we need not address the remaining issues on appeal. We must, however, review the sufficiency of the evidence to determine whether it sufficed for double jeopardy purposes. See *People v. Macon*, 396 Ill. App. 3d 451, 458 (2009) ("where a conviction

has been set aside because of an error in the proceedings leading to the conviction," the State may retry the defendant; thus, the appellate court must review the sufficiency of the evidence to "prevent the risk of exposing [the] defendant to double jeopardy"). After reviewing the record in the light most favorable to the State, we conclude that the evidence is sufficient to support the jury's verdicts beyond a reasonable doubt. Our determination is not binding on retrial and does not express our opinion as to defendant's guilt or innocence.

¶ 61                              III. CONCLUSION

¶ 62    Based on the foregoing, we reverse defendant's convictions and remand for a new trial.

¶ 63    Reversed and remanded.

**No. 2-17-0900**

| | |
|---|---|
| **Cite as:** | *People v. Lewis*, 2020 IL App (2d) 170900 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 15-CF-44; the Hon. Linda S. Abrahamson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd and Thomas A. Lilien, of State Appellate Defender's Office, of Elgin (Bryan G. Lesser, of Edelman, Combs, Latturner & Goodwin, LLC, of Chicago, of counsel), for appellant. |
| **Attorneys for Appellee:** | Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |