No. 2--06--1065

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--2955 |
| WALTER J. BONNER, | ) ) | Honorable Kathryn E. Creswell, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Walter J. Bonner appeals from his convictions of three counts of unlawful delivery of a controlled substance (720 ILCS 570/401(c)(2) (West 2004)). He argues that the State failed to prove beyond a reasonable doubt that he was not entrapped when he entered into a course of transactions with an undercover officer in exchange for sex from an informant. We determine as a matter of law that Bonner was induced by the informant to sell drugs when he was not otherwise predisposed to commit the crimes and that the effect of that inducement carried through the course of the transactions. Accordingly, because Bonner was entrapped, we reverse.

I. BACKGROUND

On October, 27, 2005, Bonner was charged by indictment with four counts of unlawful delivery of a controlled substance, arising out of his delivery of cocaine to an undercover police officer on four occasions: August 31, September 9, September 16, and September 30, 2005. Bonner

filed notice that he intended to assert an entrapment defense at trial. Before trial, the State dismissed by nolle prosequi the August 31, 2005, charge.

The facts are largely undisputed. At trial, Officer Jason Arres, a Naperville police detective, testified that he began investigating Bonner in August 2005. During the investigation, Arres used the false name of Ryan. Arres obtained information about Bonner from an informant, Kara Vedros. At that time, Vedros had at least two criminal cases pending in Du Page County, one for delivery of cannabis and another for burglary. Arres did not know whether her bond was lowered in exchange for assisting the police in other criminal cases, but an exhibit in the record shows that it was.

Arres testified that Vedros introduced Bonner to him on August 23, 2005. Arres told Bonner that he wanted to buy $50 worth of crack cocaine, and the next day Bonner and Vedros met with Arres and gave him a cereal box with crack cocaine in the bottom. Arres gave them $50. On August 29, 2005, Arres called Bonner and asked again for $50 worth of crack cocaine. Bonner said he would get back to him, and approximately 12 minutes later he called Arres and said that he would "hook that up." They arranged to meet at a Mobil gas station, where Bonner gave Arres a plastic baggie of crack cocaine in exchange for $50. Bonner told Arres to "keep the business coming," that the "stuff" would just keep getting better, and to call him.

On August 31, 2005, Arres called Bonner and asked for another $50 worth of crack cocaine. Bonner said he would check on it and call back. Bonner later met Arres at the Mobil station and gave him crack cocaine in exchange for $50.

On September 2, 2005, Arres obtained a court-authorized "eavesdrop order" and began recording most of his conversations with Bonner. On September 9, 2005, Arres called Bonner and asked for two $50 bags of crack cocaine. Bonner said he would call Arres back. He later did so and

met Arres at the Mobil station, where Arres gave him $100. Arres complained that he wanted the two "50s" packaged separately, and Bonner told Arres to separate them himself. Arres also complained that the cocaine he bought on August 31 looked light. Bonner said his girlfriend had packaged it. Later that night, Bonner called Arres and apologized because the drugs had a bad taste. Bonner offered to refund the money, but Arres said that he would keep the drugs.

On September 13, 2005, Arres called Bonner and asked again for $50 worth of crack cocaine. Arres called Bonner back, and Bonner said he would "get ahold of his guy" and call back. Bonner met Arres at the Mobil station and gave him crack cocaine. Arres complained again that it seemed a little light. Bonner said Arres could give him $45, but Arres had only a $50 bill, and he asked Bonner to make it up to him next time.

On September 16, 2005, Arres called Bonner and left a message stating that he wanted $300 worth of crack cocaine. Bonner called back approximately five hours later and told Arres that he could get only $150 worth, but that it was "good stuff" and that Arres would love it. They met at the Mobil station and Bonner gave Arres a bag of cocaine and a bag of a leafy green substance that Arres believed to be cannabis. Arres said that it did not look like $150 worth, and he and Bonner arranged to make up the difference on a future date.

On September 30, 2005, Arres called and asked for powder cocaine. Bonner replied that it would take some time to get powder cocaine but that crack cocaine was available. Bonner then delivered $150 worth of crack cocaine to Arres. Tapes of the September 9, 13, 16, and 30, 2005, transactions were played to the jury.

For his defense, Bonner presented evidence that his IQ was 73, which is at the borderline level of intelligence and means that his verbal and nonverbal abilities are lower than most people's.

Bonner did not finish high school, and he had a significant history of substance abuse. Bonner testified that he was a drug addict and that in August 2005 he started smoking crack cocaine daily.

Bonner testified that he met Vedros in 2004 and that her mother was Bonner's "drinking buddy." In June 2005, Vedros and her mother were evicted from their apartment and stayed with Bonner. Sometime before August 2005, Vedros's mother left for drug rehabilitation, and, shortly after, Vedros was arrested. Vedros was released from jail on August 13 or 14, 2005, and began asking Bonner to sell cocaine. According to Bonner she asked him "constantly," and he turned her down. However, at some point, Vedros offered to have sex with Bonner if he sold cocaine to her or to one of her friends. On August 18 or 19, Bonner and Vedros had sex, and Vedros then introduced Bonner to Arres. Bonner stated that he sold cocaine to Arres on August 24, 2005, but indicated that Vedros may have performed most of that transaction. Vedros had sex with Bonner that night. Vedros accompanied Bonner to the first two transactions with Arres but was not present after that.

According to Bonner, he sold cocaine to Arres because of Vedros and because he was an addict. Bonner testified that he got the drugs from someone else and that he kept for himself some of the cocaine that he was supposed to give to Arres. Bonner never formally measured it, and he figured that if Arres wanted it, he would take it, and "if he didn't, he didn't." Bonner gave Arres's money to the people who provided him with the cocaine. Those people would then give him a small amount of cocaine in exchange.

Bonner testified that he had not sold drugs in Naperville before he met Arres. However, the State was allowed to introduce impeachment evidence showing that, in 2001, Bonner was convicted

in Cook County of possession of a controlled substance with intent to deliver. The record shows that Bonner was familiar with street terms for drugs and the sale of drugs.

The jury was instructed on entrapment and found Bonner guilty. Bonner moved for a new trial, arguing that the State failed to negate entrapment beyond a reasonable doubt. The trial court denied the motion and sentenced Bonner to 15 years in prison on each count, the terms to run concurrently. Bonner appeals.

## II. ANALYSIS

The sole issue on appeal is whether Bonner was entrapped. Bonner argues that, while acting as a state agent, Vedros improperly induced him to sell cocaine to Arres and that he was not predisposed to commit the crimes. The State argues that, while Vedros's actions may have affected Bonner's decision to make the initial sale, which charge was dismissed, his predisposition was apparent because he continued to sell cocaine to Arres even after Vedros was no longer involved.

Entrapment is a statutory defense. Section 7--12 of the Criminal Code of 1961 provides:

"A person is not guilty of an offense if his or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this Section is inapplicable if the person was pre-disposed to commit the offense and the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense." 720 ILCS 5/7--12 (West 2004).

The "distinction between what may and may not be done by way of entrapment" was well put in People v. Outten, 13 Ill. 2d 21, 24 (1958):

"[O]fficers may afford opportunities or facilities for the commission of crime, and may use artifice to catch those engaged in criminal ventures, but entrapment constitutes a valid defense if the officers inspire, incite, persuade or lure the defendant to commit a crime which he otherwise had no intention of perpetrating. [Citation.] The law frowns upon the seduction of an otherwise innocent person into a criminal career but tolerates the use of decoys and various other artifices to catch the criminal."

"Entrapment requires that a defendant show both that the State improperly induced him or her to commit a crime and that he or she was not otherwise predisposed to commit the offense." People v. Glenn, 363 Ill. App. 3d 170, 173 (2006), citing People v. Placek, 184 Ill. 2d 370, 380-81 (1998).

"A defendant who raises entrapment as an affirmative defense to a criminal charge necessarily admits to committing the crime, albeit because of improper governmental inducement." People v. Rivas, 302 Ill. App. 3d 421, 432 (1998). "Once a defendant presents some evidence, however slight, to support an entrapment defense, the State bears the burden to rebut the entrapment defense beyond a reasonable doubt." Rivas, 302 Ill. App. 3d at 432-33. "The question of entrapment is usually one to be resolved by the trier of fact, and it will not be disturbed on review unless the reviewing court finds that a defendant was entrapped as a matter of law." Rivas, 302 Ill. App. 3d at 433.

### A. Inducement

There is no entrapment unless the government "incited or induced" the offense. 720 ILCS 5/7–12 (West 2004). Inducement does not lie where the government "merely affords to [the defendant] the opportunity or facility for committing an offense" (720 ILCS 5/7–12 (West 2004)),

which means that "entrapment does not exist as a matter of law merely because a government agent initiates a relationship leading to a drug transaction." People v. Day, 279 Ill. App. 3d 606, 612 (1996). But the inducement prong is met when the course of criminal conduct for which the defendant was convicted originated in the mind of a government agent who arbitrarily engaged in a relationship with the defendant and purposely encouraged its growth. Day, 279 Ill. App. 3d at 612; see also People v. Poulos, 196 Ill. App. 3d 653, 659-60 (1990).

Here, Vedros, acting as an agent of the police, did more than furnish Bonner an opportunity for illegality. When Bonner initially refused to sell drugs, Vedros solicited him "constantly." Defendant repeatedly refused. He agreed only after Vedros offered sexual favors, a tactic of known efficacy. See People v. Estrada, 91 Ill. App. 3d 228, 234 (1980) (entrapment instruction was necessary because evidence showed that defendant transacted in drugs at informant's suggestion after she initiated a sexual relationship with him). Lesser efforts than these have been considered inducement. See Day, 279 Ill. App. 3d at 612 (inducement found where defendant refused informant's repeated requests to sell drugs and acquiesced only after he commenced a dating relationship with informant); Poulos, 196 Ill. App. 3d at 656 (defendant initially rebuffed informant but agreed to sell drugs after "15 to 20" solicitations); People v. Fisher, 74 Ill. App. 3d 330, 335 (1979) (the evidence "reveals that after numerous attempts by [the informant] to have the defendant sell him amphetamines (all of which were resisted), an overwhelming desire to 'get rid' of [the informant] and to have him stop bothering her compelled [the defendant] to commit the offense"). We find as a matter of law that the government induced Bonner to perform the drug transactions. The next question is whether Bonner was predisposed to commit the crimes.

B. Predisposition

Bonner argues that he was not predisposed to commit the crimes, because he adamantly refused to sell drugs until Vedros offered him sex. He further argues that his continuing drug transactions were so tainted by the initial inducement that he cannot be said to have been predisposed to undertake those sales. The State, however, points to Bonner's past drug use and willingness to continue to sell drugs to Arres, even after Vedros was not involved, as evidence that he was predisposed to commit the crimes.

"Generally, predisposition is established by proof that the defendant was ready and willing to commit the crime without persuasion and before his or her initial exposure to government agents." People v. Criss, 307 Ill. App. 3d 888, 897 (1999).

"Several factors are relevant in assessing predisposition in drug cases, including the following: (1) the defendant's initial reluctance or willingness to commit the crime; (2) the defendant's familiarity with drugs; (3) the defendant's willingness to accommodate the needs of drug users; (4) the defendant's willingness to profit from the offense; (5) the defendant's current or prior drug use; (6) the defendant's participation in cutting or testing the drugs; and (7) the defendant's ready access to a supply of drugs." Glenn, 363 Ill. App. 3d at 173, citing Placek, 184 Ill. 2d at 381.

Courts have also considered (8) the defendant's engagement in a course of conduct involving similar offenses; and (9) the defendant's subsequent activities. See Day, 279 Ill. App. 3d at 612; Poulos, 196 Ill. App. 3d at 661.

Applying these factors, we find as a matter of law that Bonner was not disposed to sell drugs before Vedros became involved. Bonner was initially unwilling to transact in drugs and became willing only after Vedros's repeated requests and her eventual initiation of a sexual relationship.

When he did commence selling drugs to Arres, Bonner's role in the distribution scheme was limited. He was not involved in the processing or packing of the drugs and was little more than a courier. In that role, Bonner showed unmistakable savvy but also a lack of discipline and devotion to the trade. He obviously knew the vocabulary of drug use and trafficking. He returned Arres's phone calls quickly, offered a refund when Arres complained about the quality or quantity of the cocaine, and promised Arres that the drugs would increase in quality if Arres continued buying. On one occasion, however, Bonner delivered a $100 bag of cocaine to Arres even though Arres requested two $50 bags, and Bonner refused to remedy the problem. Bonner showed indifference to Arres's business in other ways as well. For instance, Bonner testified that he never formally measured the quantities of drugs that his supplier provided for delivery to Arres. Bonner also stated that he even kept for himself some of what his supplier provided for Arres. Bonner was cavalier toward the risk inherent in these practices, stating that if Arres wanted the drugs, he would take them, and "if he didn't, he didn't." There was no evidence that Bonner profited from the transactions other than by taking some of the cocaine that was due Arres and receiving some from the supplier.

Although Bonner had an admitted history of drug use and addiction, and an older conviction of possession with intent to deliver, there was no evidence that before Vedros became involved he was engaged in a course of conduct of similar offenses or had any desire to become a drug dealer. There was also no evidence that Bonner sold drugs to anyone else during or after the series of sales to Arres.

Bonner was not a devoted drug dealer even after the inducement. We see no evidence that he would have been willing and able to sell drugs without the pressure applied by Vedros. To the extent that Bonner exhibited signs of a disposition to sell drugs, he did so only after he was induced

by Vedros to begin the course of conduct. "[P]redisposition is necessarily determined by a defendant's willingness to participate in criminal activity before his initial exposure to government agents." (Emphasis in original.) People v. Connor, 176 Ill. App. 3d 900, 906 (1988); Poulos, 196 Ill. App. 3d at 662 (to rebut defense of entrapment, the State must do more than "establish that once induced to commit the offense, defendant in fact committed the offense"). Thus, Vedros's activities were crucial. See Connor, 176 Ill. App. 3d at 906. Further, "[t]here is no requirement that the defendant demonstrate an attempt to withdraw once induced into committing the offense." Poulos, 196 Ill. App. 3d at 663. Bonner was not predisposed to sell cocaine before Vedros became involved. Any later disposition Bonner exhibited was irrelevant. Finally, we note that the State did not call Vedros as a witness to attempt to contradict any of Bonner's testimony--a factor that weighs against the State. See Day, 279 Ill. App. 3d at 612.

We recognize that, though Bonner is claiming entrapment with respect to transactions that occurred as late as September 30, 2005, he admitted that Vedros did not accompany him to any transactions after August 29, 2005, and there is no evidence that Vedros had sex with Bonner after August 24, 2005. The entrapment defense may, however, apply "where a defendant is prosecuted for a transaction which occurs after a series of transactions." People v. Gaytan, 186 Ill. App. 3d 919, 925 (1989), citing Sherman v. United States, 356 U.S. 369, 374, 2 L. Ed. 2d 848, 852, 78 S. Ct. 819, 822 (1958). Where the later transaction "is not an independent act subsequent to the inducement, but part of a course of conduct which was the product of the inducement," then the entrapment defense will lie with respect to that transaction. Gaytan, 186 Ill. App. 3d at 925, citing Sherman, 356 U.S. at 374, 2 L. Ed. 2d at 852, 78 S. Ct. at 822.

In Sherman, Kalchinian met the defendant, Sherman, in August 1951 at a doctor's office where both were undergoing treatment for drug addiction. Kalchinian was at the time "an active government informer who had but recently been the instigator of at least two other prosecutions." Sherman, 356 U.S. at 373-74, 2 L. Ed. 2d at 852, 78 S. Ct. at 821. Kalchinian had not yet contacted the government about Sherman. Kalchinian and Sherman became acquainted and discussed their addiction problems. Once he established a relationship with Sherman, Kalchinian asked him if he knew of a good source of narcotics. At first, Sherman refused to speak on the topic, but after several entreaties, which included appeals to sympathy based on Kalchinian's withdrawal symptoms, Sherman acceded. As the Supreme Court described it: "One request was not enough, for Kalchinian tells us that additional ones were necessary to overcome, first, [Sherman's] refusal, then his evasiveness, and then his hesitancy in order to achieve capitulation." Sherman, 356 U.S. at 373, 2 L. Ed. 2d at 852, 78 S. Ct. at 821. On several occasions thereafter, Sherman obtained drugs that he shared with Kalchinian, and the two split the cost. After a number of these sales, Kalchinian contacted the police, who set up surveillance and observed Sherman sell drugs to Kalchinian on three additional occasions in November 1951. Sherman, 356 U.S. at 371, 2 L. Ed. 2d at 851, 78 S. Ct. at 820.

The Supreme Court found as a matter of law that Sherman was entrapped into the November 1951 drug sales. The Court found that Kalchinian was an agent of the State when he met Sherman, because Kalchinian was under prosecution for drug trafficking and had an ongoing agreement with the government to provide information about drug trafficking. Sherman, 356 U.S. at 373-74, 2 L. Ed. 2d at 852, 78 S. Ct. at 821-22. The Court found it "patently clear" that Sherman was induced to transact with Kalchinian. Sherman, 356 U.S. at 373, 2 L. Ed. 2d at 851, 78 S. Ct. at 821. The

Court also found that the effects of Kalchinian's inducement persisted through the November 1951 sales because these sales were part of the same "course of conduct" as the earlier sales. Sherman, 356 U.S. at 374, 2 L. Ed 2d at 852, 78 S. Ct. at 822.

In this case, as in Sherman, the criminal charges pertained to sales that occurred weeks after the inducement. The particular inducement here, which consisted of repeated solicitations and an eventual offer of sexual favors, was as potent as the inducement in Sherman. Like the Court in Sherman, we can identify no point at which the inducement might have lost its effect amid the cluster of transactions. We hold that all of the charged sales were the product of Vedros's inducement.

### III. CONCLUSION

We determine that Bonner was improperly induced to commit the crimes when he was not predisposed to do so. Thus, he was entrapped as a matter of law, and we reverse his convictions and sentences.

Reversed.

GROMETER and JORGENSEN, JJ., concur.