2022 IL App (2d) 180906-U
No. 2-18-0906
Order filed November 3, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-1427 |
| SAFANDRE LINDSEY, | ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: (1) The evidence supported the circuit court's finding that defendant was not entrapped; and (2) defendant's Class X sentence was not statutorily authorized. Therefore, we affirm defendant's convictions but vacate his sentence and remand for resentencing.

¶ 2   After a bench trial, defendant, Safandre Lindsey, was found guilty of three counts of unlawful delivery of a controlled substance within 1000 feet of a school or park (720 ILCS 570/407(b)(1), (b)(2) (West 2014)), arising out of drug deliveries he made to an undercover police officer on three occasions:  May 22, May 25, and May 27, 2015.  Defendant delivered heroin to the undercover officer during the first two transactions and cocaine on the third.  Defendant was

also found guilty of one count of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2014)) stemming from his possession of heroin at the time of his arrest for these offenses. Based on his criminal history, the circuit court sentenced him as a Class X offender to 18 years' imprisonment, to be followed by three years of mandatory supervised release (MSR). For the reasons that follow, we affirm defendant's convictions but vacate his sentence and remand the cause for sentencing.

¶ 3                                  I. BACKGROUND

¶ 4      We summarize the facts adduced at trial and appearing in the record. In April 2015, defendant met a woman named Trish, who lived next door to defendant's friend. Trish told defendant that she "got high, too," and she asked defendant if he wanted to come over to get high with her. Defendant subsequently went to Trish's house nearly every day and got high with her. Trish asked defendant if she wanted to meet her friend, "Scott," because she wanted defendant to sell drugs to him. "Scott" was really Detective Chris Tucker of the Elgin police department's narcotics unit. Defendant declined Trish's request, but Trish continued to ask him every time he saw her. Defendant "told her no every time."

¶ 5      Defendant testified that Trish offered to have sex with him if he would meet "Scott" and sell drugs to him. Defendant agreed and, on May 22, 2015, they had sex. Within "like an hour" of having sex, Trish accompanied defendant to meet Detective Tucker in the parking lot of a grocery store in Elgin. They got into Tucker's undercover vehicle; Trish sat in the front passenger seat, defendant sat in the rear passenger seat, and Tucker was in the driver's seat. A drug delivery

took place in Tucker's vehicle.[1]  This incident did not result in a criminal charge.  Defendant testified that he and Trish had sex "maybe five" times "within the next couple months or so."

¶ 6        Later in the evening that same day, on May 22, Tucker called defendant and arranged for defendant to sell him $80 worth of heroin.  Tucker testified that defendant told him to head toward Elgin and to call him when he got close.  Tucker did so, and, during a second phone call, they agreed to meet outside of a liquor store in Elgin.  When Tucker arrived, he parked his vehicle and placed several calls to defendant's cell phone, but they went straight to voicemail.  Defendant called him back and explained that his calls were going to voicemail because his phone had died due to a lot of people calling him.  Defendant arrived and approached Tucker's vehicle and entered the front passenger seat.[2]  Tucker handed defendant $80, and defendant gave him a baggie of heroin.  Tucker testified that defendant stated "It's raw.  It's always raw with me."  Based on Tucker's training and experience, he understood defendant's statement to mean that the heroin was

---

[1]Detective Tucker testified that he believed defendant handed the drugs to him, but he was uncertain.  He also testified that he could not recall who he handed the money to.  Defendant testified that he did not participate in the transaction, and that it occurred between Trish and Tucker.

[2]Defendant testified that, when he got into Tucker's car, Trish was already in the back driver's side seat.  Tucker testified that Trish was "absolutely not" present in the car for that meeting.  The State called Lieutenant Christian Jensen, who testified that he was the "follow car" for this transaction.  He testified that he was 20-50 yards away from Tucker's undercover vehicle and never saw a woman enter Tucker's vehicle.  The only person in the car other than Tucker was a man who got into the front passenger seat during the transaction.

pure heroin, as opposed to heroin that was mixed up with cutting agents. Defendant then asked Tucker to drive him to the intersection of S. Gifford Street and Villa Street. When they arrived at the location, defendant exited the vehicle and, according to Tucker, defendant stated that if Tucker wanted to buy heroin in the future, that he should pick him up at that spot. Tucker testified that defendant told him that location was his girlfriend's house. Defendant testified that the location was near his dealer's house, and he had Tucker drive him there so that he could give the money Tucker had just given him to his dealer. Tucker video recorded this transaction using a "button camera," which he testified worked well in low-light conditions. No audio of this transaction was recorded. Defendant testified that he delivered drugs to Tucker "[b]ecause I do drugs and because Trish offered to have sex with me."

¶ 7     The second charged transaction occurred on May 25, 2015. Defendant called Tucker at approximately 1:40 p.m. and asked him if he would need heroin that day. Tucker said that he did, but that he was at work and that he would call him later that evening. Tucker obtained a "24-hour overhear" so that he could record his phone call with defendant. Tucker called defendant back at 5:17 p.m. A recording of the call was admitted into evidence along with a transcript. During the call, Tucker asked defendant if he was "straight," which Tucker testified meant "do you have drugs for sale?" Defendant replied "yeah, yeah," and told him to meet him at Gifford and Villa in fifteen minutes. Defendant asked Tucker, "what you wanted?" and Tucker replied "I got a bill. I got a hundo." Defendant replied "ok, I got you." Tucker understood defendant's statement to mean that he had $100 worth of heroin to sell him. Tucker obtained a video camera from his office and drove to the meeting spot.

¶ 8     Defendant was sitting outside when Tucker pulled up. Defendant walked over and entered the front passenger seat of the vehicle. Tucker handed him $100, and defendant asked him to drive

him down the street to his "boy's crib" to get some cannabis. Tucker agreed but, before they started driving, Tucker asked defendant if he "got it" and if they "were all good." Defendant replied "yeah, I got it on me." As they drove, defendant took a bag of heroin out of his mouth and handed it to Tucker.

¶ 9 While traveling to the other location, defendant told Tucker that when he gave him "four bags" the prior week, he intended to give Tucker "six bags," but the "girl" took two of them. Tucker replied with, "that fucking bitch," to which defendant stated, "that's what I'm used to dealing with."

¶ 10 Defendant also brought up the subject of cocaine, which they had not previously discussed. He stated to Tucker that he "got the hard around, too," and that he charged $50 per gram. Tucker testified that "hard" meant crack cocaine. Based on his training, he understood that defendant was offering to sell him crack cocaine for $50 per gram. As they continued to drive, Tucker said that he should have brought more money with him because he knew people in St. Charles that he could sell it to and make money. Defendant told Tucker that he could call him and that he would "have it ready when you get here." Tucker asked defendant to confirm the price by asking "$50 a gram?" to which defendant relied, "yup."

¶ 11 When they arrived at the location to which defendant directed them, near the intersection of Douglas Avenue and Summit Street, defendant exited the vehicle and walked toward a house on Douglas. After a few minutes, Tucker called defendant and asked how much longer he would be. Defendant replied that he would be right out. Defendant then returned to the vehicle, and Tucker drove him back to Gifford and Villa. Defendant testified that he wanted to return to Gifford and Villa so that he could "give the dealer his money." While they drove, defendant said that he "got soft, too," which Tucker testified meant cocaine that is snorted rather than smoked. Tucker

responded, "you got fucking everything. You don't got nobody with no ecstasy, do you?" Defendant answered "yup," and asked Tucker whether he "want[ed] pills or Molly." Tucker specified that he wanted pills, and defendant replied "[a]ll you do is call me ahead of time and I don't got pills, but my guy got them." Defendant stated that Tucker should "[j]ust tell [him] ahead of time and [that he would] have 'em drop 'em off to you." Defendant testified that he did not personally have these drugs. As they drove, defendant pointed out that they were passing a police station. He told Tucker that he drove past the police station nearly every day to "get me some weed." Tucker stated that he was going to see if he could get more money and, if he could, he would contact defendant. Tucker asked defendant if he preferred to be contacted via phone call or text message, and defendant replied that it did not matter and that he changes his phone number every two months. Tucker testified that it would not be unusual for a drug dealer to frequently change his or her phone number.

¶ 12     As they continued to drive, Tucker and defendant returned to the subject of the woman who had taken two bags of heroin from the delivery meant for Tucker. Defendant stated, "I don't like that shit because I pay [her] for bringing me customers though. Don't take out of our customer's shit." He then stated that he "gave her three fucking bags just for bringing you to me." Defendant also stated that he was "the only motherfucker out here with raw," and that "everybody else's shit is all shooken up." Defendant also told Tucker that he never sleeps and that he could "come whenever the fuck you want." Tucker replied that "that's what I'm looking for," and "if you got hard, that's what I'm talking about, because I could make money off that." Defendant then showed Tucker the bag of cannabis he had just picked up and told him to smell it because it smelled good. They continued to talk about cannabis before Tucker dropped off defendant.

¶ 13    On May 27, 2015, defendant and Tucker exchanged text messages throughout the afternoon. The first text message Tucker received from defendant that day asked what time Tucker was coming, and Tucker replied "[p]rolly like 7." Tucker then asked, "How much hard for $200?" Defendant replied, "I'll give you 4 gram." Tucker testified that meant defendant offered to sell him four grams of crack cocaine for $200. Tucker called defendant at 7:20 p.m., and a recording of the phone call was admitted into evidence. During the call, Tucker told defendant that he would be back in the area around 8:15 p.m., and defendant told him that they should meet at the same place as last time.

¶ 14    Tucker drove to Gifford and Villa, but defendant was not there. Tucker sent a text message to defendant stating "here," and defendant immediately called him back and said he was in the area of Highland Avenue and Route 31. Tucker drove to that area and picked up defendant at Highland and McClure Avenue. Defendant instructed Tucker to drive back to Gifford and Villa. Tucker asked defendant if he had the drugs, and he said they were "at the crib." Defendant explained that he was at Highland and McClure because he was receiving a breathing treatment for his asthma. He told Tucker that he had to "run over here" because he could not breathe and that he needs a new inhaler.

¶ 15    Defendant also stated that he did not trust "ol' girl" now that he met Tucker, and he believed that Trish was trying to set him up because he thought the police may have been following him.[3] Defendant stated that, two days prior, he went to the "crib" next door to Trish and asked the woman living there to let him in because police were in the area. The woman told defendant to "just keep

_____

[3]At trial, defendant denied believing that Trish was trying to set him up. He stated that he "was just making conversation" when he made those statements to Tucker.

walking" because Trish had called the police on her. Defendant hypothesized that Trish and the woman next door were "having wars about who *** they're buying their dope from and all this shit." Defendant also stated that he "was going to serve the bitch next door," but that Trish called the police on him.[4] Both Tucker and defendant testified that "serving" meant delivering drugs. Defendant also told Tucker that Trish told him to never "serve that bitch again" because the police were outside her house. Defendant asked a "dude that was at" Trish's house whether "ol' girl" called the police on Trish, but the man stated that Trish called the police on herself. Defendant told Tucker that "when motherfuckers get high, you ain't no telling what the fuck they do." Tucker commented that he was "paranoid, too" about "motherfuckers I serve," and that he sees police cars frequently in St. Charles, where he lived. Defendant responded that he was not "worried about no squad car" because "these motherfuckers will never catch me." He also stated that he "ain't worried about the detectives" and that he did not have a drug case since 2001.

¶ 16    When they arrived at Gifford and Villa, defendant told Tucker to wait 10 minutes, because he had to "go and cook this shit up," and that he meant to do it earlier. Tucker stated that he would "take it soft" because someone was waiting for him. Defendant exited the car and returned a short time later. He handed a small bag of cocaine to Tucker and said, "shit comes back good as hell, too, man." Tucker questioned whether what defendant handed him was actually four grams. Defendant stated that he forgot that Tucker wanted four grams and that he had only given him two grams. Tucker asked defendant if he could give him $100 back, and defendant asked Tucker whether he wanted $100 back or whether he wanted the other two grams. Tucker asked defendant

---

[4]Defendant testified that Trish did not direct him to deliver drugs to the woman next door. Also, during his testimony, defendant denied delivering drugs to Trish's next-door neighbor.

if he had another two grams, and defendant answered, "Yeah, Yeah, just hold on right here. Just hold the money. I'll be right back." Defendant gave the $200 back to Tucker and exited the vehicle. Regarding this transaction, defendant testified that he did not package the drugs originally, and that "the dealer did it." He testified that when he left the vehicle, he "went back in and gave the bag back to the dealer and told him [that Tucker] wanted more, whereupon the dealer added more drugs to the bag. Defendant returned to the vehicle with the additional drugs and delivered them to Tucker, and they parted ways. Defendant testified that after the transaction was completed, he "took the money back in" to his dealer. Defendant agreed that Trish did not ask him to deliver drugs to Tucker on either May 25 or May 27, 2015.

¶ 17 Tucker testified that, on September 6, 2015, he sent text messages to defendant from a different phone number posing as a female looking to purchase heroin. Defendant confirmed during his testimony that he had a different phone number at the time of his arrest in September 2015 as compared to when the transactions occurred in May 2015. Tucker did not have copies of the text messages, but he testified that defendant texted back and asked where he knew her from. Tucker replied that they had met "through someone else." Tucker testified that defendant "advised that he would sell me heroin and we'd meet" near the Dairy Queen on West Chicago Street in Elgin. That location was near Highland and McClure, which is where Tucker picked up defendant during the May 27, 2015, transaction. Tucker testified that he texted defendant from a different phone number and posing as a different person "because we wanted to get [defendant] out to arrest him on the three previous deliveries."

¶ 18 Defendant was arrested later that day, on September 6, 2015, near the Dairy Queen. Police recovered from defendant's person two bags of heroin, two syringe needles, and a spoon. Defendant testified that the heroin was for personal use.

¶ 19    At the Elgin police station, Tucker questioned defendant while wearing a balaclava ski mask to disguise his appearance. Tucker told defendant that he was at the police station because he "sold heroin to somebody he really shouldn't have." Defendant replied that he does not sell heroin, but that he was "just a middleman." Tucker testified that a "middleman" is akin to a broker between the dealer and the buyer. Tucker explained that a middleman "will go and get the drugs, get the money, and make the transaction where the other two parties don't actually meet each other." Defendant told Tucker that he acted as a middleman because he is a heroin addict and, as a result, he knows many people who sell heroin and many people who wish to purchase it. Tucker testified that defendant told him that he gets heroin for people who are sick and in turn "makes a little money for himself on the side" to support his own heroin addiction.

¶ 20    Defendant testified that he had never "middle-manned" any drug deals other than his encounters with Detective Tucker. Defendant also denied packaging the drugs before delivering them to Tucker, and he always went to Gifford and Villa to obtain the drugs, because that is where his dealer lived. Defendant testified that he would get the drugs from his dealer, give them to Tucker and, in turn, he would bring the money that he received from Tucker to the dealer.

¶ 21    The circuit court admitted evidence of defendant's 2014 forgery conviction for impeachment purposes, as well as defendant's 1999 conviction for delivery of a controlled substance to rebut defendant's entrapment defense, which the State argued showed defendant's predisposition. The court admitted certified statements of conviction for both offenses.

¶ 22    Prior to trial, defendant filed a motion requesting the circuit court "to admonish [him] of the new sentencing provisions set forth in 720 ILCS 570/407 and/or 720 ILCS 570/401." He stressed that 720 ILCS 570/407(b) was amended effective January 1, 2018, to prohibit the delivery of a controlled substance within 500 feet of a school, public park, or church, instead of 1000 feet

as previously provided. Defendant noted that counts 1, 3, and 4 were charged under section 407(b) of the Illinois Controlled Substances Act (720 ILCS 570/407(b)(1), (b)(2) (West 2014), and he stated that he was "electing to be sentenced on Count[s] 1, 3 and 4 under the amended statute." He argued that the amendment "affects sentencing only," and that due process considerations required that he be permitted to choose between the sentencing provisions. The circuit court granted the motion, reasoning that "section 407 is a sentencing statute for 401," such that defendant was entitled to elect which sentencing scheme, "the old or the new 407," under which he would be sentenced if convicted. Count 1 was reduced from a Class X felony to a Class 1, and one of the Class 1 deliveries was reduced to a Class 2. The State asserted that the third delivery was within the 500 feet requirement as provided in the revised statute, so it remained a Class 1 offense.

¶ 23    Following closing arguments, the circuit court rejected defendant's entrapment defense and found him guilty on all counts. It found that, although Trish, the government's confidential informant, induced defendant to commit the offense by offering to have sex with him if he agreed to meet and sell drugs to Tucker, defendant was predisposed to commit the offenses. The court analyzed defendant's predisposition by applying the nine factors we outlined in *People v. Bonner*, 385 Ill. App. 3d 141 (2008). It noted that defendant's recorded conversations with Tucker suggested no reluctance or unwillingness to commit the crime and that he complimented his own product while denigrating the product of others. It also noted that defendant offered to sell Tucker cocaine instead of heroin if he desired it, and that defendant showed great familiarity with drugs. It stated that defendant was willing to accommodate Tucker's needs, including offering to "cook up" the powder cocaine, contacting Tucker to inquire whether he needed more heroin, and stating "I got you" when Tucker stated that he had $100. Defendant also offered to make the amount right when the Tucker complained that he was given two grams instead of four. It found that defendant

was willing to profit from the drug sales, as supported by his statement during his interview at the police station that he sells to people who are sick and makes a little money on the side. Regarding defendant's drug usage, the court noted that defendant testified that he was addicted to heroin and that he was holding a controlled substance at the time of his arrest. In analyzing defendant's participation in "cutting or testing the drugs," the court again noted that defendant was ready and willing to "cook up" the powder cocaine into crack cocaine if the undercover officer wanted him to. The court also found that defendant had a ready access to a supply of drugs because, within a short period, he was able to supply the undercover officer with controlled substances in three separate transactions, and he never stated that he was unable to deliver. Regarding defendant's "engagement in a course of conduct involving similar offenses," the circuit court observed that defendant was convicted in 1999 of the same offense, and that he bragged to the undercover officer that the police would "never catch" him and that he changed his cell phone number every two months. Finally, concerning the defendant's "subsequent activities," the circuit court reiterated that defendant possessed narcotics at the time of his arrest, which was approximately four months after the events that lead to the charged offenses.

¶ 24    At the sentencing hearing, the circuit court analyzed the statutory factors in mitigation and aggravation, and it found that defendant's criminal conduct was not induced or facilitated by someone other than defendant. See 730 ILCS 5/5-5-3.1(a)(5) (West 2018). The court acknowledged that Trish was "involved in this matter," but it stated that she "was assisting the police in the beginning" but "not after that." It stressed that, although defendant was induced to perform the first transaction, that transaction "wasn't even charged." The court explained that "after that [first transaction], there [were] sufficient transactions which were all on the defendant."

The court could not "put those on anybody but [defendant] based on the testimony and the recordings of his conversations and what we went through further previously about entrapment."

¶ 25    Defendant was sentenced on September 24, 2018. In imposing sentence, the court stated that the matter was a "mandatory department of corrections case." Based on defendant's criminal history, which included convictions for three Class 1 felonies for unlawful delivery of a controlled substance stemming from an offense defendant committed when he was 17 years old, as well his Class 2 felony conviction for aggravated domestic battery, the court determined that section 5-4.5-95(b) of the Unified Code of Corrections (Unified Code) (730 ILCS 5-4.5-95(b) (West 2016)) required that defendant be sentenced as a Class X offender, for which the court noted had a sentencing range of "six to 30" years' imprisonment. Defense counsel made no argument that defendant was not subject to Class X sentencing. As noted, the circuit court sentenced defendant to a term of imprisonment of 18 years, to be followed by three years of MSR.

¶ 26    On October 1, 2018, defendant filed a motion to reconsider sentence arguing, pertinently, that the circuit court failed to properly apply the mitigating factor that defendant's criminal conduct was induced or facilitated by another. He argued that the court should have applied this mitigating factor in light of its prior finding that defendant was induced to perform the drug transactions. In denying defendant's motion to reconsider sentence, the court stated: "I believe there was inducement at the beginning. But as time went on and because of the defendant's behavior and the actions of the defendant, I felt that he was no longer induced."

¶ 27    Defendant timely filed a notice of appeal.

¶ 28                                    II. ANALYSIS

¶ 29    On appeal, defendant argues that (1) the State failed to rebut beyond a reasonable doubt his affirmative defense that he was entrapped by a government informant to deliver controlled

substances to the undercover officer; and (2) he was erroneously sentenced as a Class X offender under section 5-4.5-95(b) of the Unified Code because his criminal history did not qualify him for Class X sentencing. We address each issue in turn.

¶ 30                                      A. Entrapment Defense

¶ 31    Defendant first contends that the State's evidence was insufficient to rebut, beyond a reasonable doubt, his affirmative defense of entrapment. While he agrees with the circuit court's finding that he was induced to commit the drug offenses, he maintains that he was not predisposed to commit the offenses.

¶ 32    A defendant who raises entrapment as an affirmative defense to a criminal charge "necessarily admits to committing the crime, albeit because of improper government inducement." *Bonner*, 385 Ill. App. 3d at 145 (quoting *People v. Rivas*, 302 Ill. App. 3d 421, 432 (1998)). Entrapment is governed by section 7-12 of the Criminal Code of 2012. It provides:

> "A person is not guilty of an offense if his or her conduct is incited or induced by a
> public officer or employee, or agent of either, for the purposes of obtaining evidence for
> the prosecution of that person. However, this Section is inapplicable if the person was pre-
> disposed to commit the offense and the public officer or employee, or agent of either,
> merely affords to that person the opportunity or facility for committing an offense." 720
> ILCS 5/7-12 (West 2014).

¶ 33    A defendant invoking an entrapment defense must show both that (1) the State improperly induced him or her to commit a crime, and (2) he or she was not otherwise predisposed to commit the offense. *Bonner*, 385 Ill. App. 3d at 145. "For an entrapment defense to succeed, the evidence must disclose an improper inducement on the part of the public officer or employee, and a lack of predisposition to commit the crime on defendant's part." *People v. Keen*, 206 Ill. App. 3d 940,

948 (1990). If the defendant presents some evidence, however slight, to support the defense of entrapment, the burden shifts to the State to rebut the defense beyond a reasonable doubt. *People v. Anderson*, 2013 IL App (2d) 111183, ¶ 60; *Bonner*, 385 Ill. App. 3d at 145. See also *People v. Placek*, 184 Ill. 2d 370, 381 ("[o]nce a defendant presents some evidence to support an entrapment defense, the State bears the burden to rebut the entrapment defense beyond a reasonable doubt, in addition to proving all other elements of the crime).

¶ 34    The question of whether a defendant was entrapped is one for the trier of fact. *Bonner*, 385 Ill. App. 3d at 145. The trier of fact's determination of entrapment will not be set aside unless the defendant was entrapped as a matter of law. *Id*. The standard on appeal that we use to review the trier of fact's resolution of an entrapment defense is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Day*, 279 Ill. App. 3d 606, 611 (1996). See also *Placek*, 184 Ill. 2d at 381 ("a reviewing court must affirm where, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

¶ 35    The inducement prong of an entrapment defense is "met when the course of criminal conduct for which the defendant was convicted originated in the mind of a government agent who arbitrarily engaged in a relationship with the defendant and purposely encouraged its growth." *Bonner*, 385 Ill. App 3d at 145. As noted, the circuit court found that defendant was induced to commit the offense, which satisfied the first prong of the entrapment defense. In making this finding, the court relied on *Bonner*, which it commented had "surprisingly similar" facts to the instant matter. In *Bonner*, the government's informant "did more than furnish [the defendant] an opportunity for illegality." *Id*. There, the informant constantly solicited the defendant to sell drugs

and the defendant repeatedly refused, but he eventually relented and agreed to sell drugs after the informant offered him sexual favors. *Id.* We commented in *Bonner* that the promise of sexual favors is a tactic of known efficacy and that "lesser efforts," such as the promise of a dating relationship, have been considered sufficient to satisfy the inducement prong. *Id.* (citing *People v. Day*, 279 Ill. App. 3d 606, 612 (1996)).

¶ 36 Here, expressly persuaded by *Bonner*, the circuit court found that defendant was induced by Trish, a government informant, to deliver controlled substances to Tucker, an undercover officer. It noted that the State did not call Trish to testify at trial, which it found "significant" because only she could have rebutted defendant's assertions regarding the promise of sex in exchange for selling controlled substances to Tucker. Again, defendant testified that he declined Trish's repeated requests to sell drugs to her "friend," but he eventually relented because she offered to have sex with him. Defendant further testified that, within approximately one hour of having sex with Trish, they met Tucker in a nearby parking lot, where an uncharged drug delivery took place inside Tucker's vehicle. Defendant testified that Trish had sex with him approximately five times over the "next couple months," which the circuit court noted was a timeframe that exceeded the period in which defendant delivered controlled substances to Tucker.

¶ 37 Of course, defendant, on appeal, asserts that the circuit court's finding that he was induced to commit the offenses was correct under *Bonner*. Nevertheless, defendant appears to argue that the circuit court erred in finding that he was induced only as to the first interaction between Tucker and defendant (which, again, was an uncharged offense) but not the subsequent, charged deliveries. Defendant asserts that this finding runs afoul of *Bonner*, where we found that all of the drug transactions were the product of the informant's inducement, even though some transactions occurred more than one month after the informant ceased both having sex with the defendant and

accompanying him to the transactions, because there was "no point at which the inducement might have lost its effect amid the cluster of transactions." *Id.* at 147-49.

¶ 38    Defendant's argument is unavailing.    The transcript of the circuit court's ruling demonstrates that, within the confines of defendant's entrapment defense, the court *agreed* with him that he was induced to perform the charged drug offenses.  In announcing its ruling, the circuit court stated that it found "as a matter of law that the police induced [defendant] to perform the drug transaction," and it further stated that defendant "was induced to deliver to the undercover" officer.  In other words, defendant prevailed on the first prong of his entrapment defense, namely that the confidential informant induced the illegal conduct.  See *Anderson*, 2013 IL App (2d) 111183, ¶ 60 ("[a] defendant invoking an entrapment defense must present evidence that (1) the State induced or incited him to commit the crimes and (2) he lacked the predisposition to commit the crimes").  Defendant's entrapment defense failed not because there was a lack of inducement for the charged drug offenses, but because the circuit court found defendant was predisposed to commit the offenses.

¶ 39    The circuit court's statements that defendant seizes upon were made during the sentencing hearing, where the court considered the applicable aggravating and mitigating factors in the Unified Code, including whether "defendant's criminal conduct was induced or facilitated by someone other than the defendant."  See 730 ILCS 5/5-5-3.1(a)(5) (West 2018).  In light of the finding favorable to defendant that he was induced to commit the offenses, it is apparent that the court's comments had no practical effect on defendant's entrapment defense, but instead related only to the court's weighing of the applicable factors in aggravation and mitigation in fashioning an appropriate sentence.  Defendant makes no argument that the court erred in weighing the factors in mitigation.  To the extent that defendant perhaps could have, but did not, argue that his sentence

was excessive because of how the circuit court considered the mitigating factor that the criminal conduct was induced by someone other than defendant (as he argued in his motion to reconsider sentence), the argument is forfeited. Because the circuit court plainly agreed with defendant that he was induced by the government's agent to sell drugs to Tucker, we proceed to the next question in evaluating whether he was entrapped, namely, whether defendant was predisposed to commit the offenses. See *Bonner*, 385 Ill. App. 3d at 146 (once a trier of fact determines that a defendant was induced by the government to commit the offense, the next step is to determine whether the defendant was predisposed to commit the offense).

¶ 40    Predisposition, in the entrapment context, focuses on the defendant's *mens rea* before the exposure to government agents. *People v. Lewis*, 2020 IL App (2d) 170900. To sustain its burden of proving defendant was not entrapped to commit the offense, the State was required to show he was predisposed to commit the offense. *People v. Latona*, 268 Ill. App. 3d 718, 725 (1994). That is, the State needed to show that defendant was "ready and willing to commit the crime without persuasion and before his or her initial exposure to government agents." *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 38 (quoting *People v. Criss*, 307 Ill. App. 3d 888, 897 (1999).

¶ 41    Defendant argues that the instant matter is analogous to *Bonner*, where we determined that the defendant was induced by the informant to sell drugs and not otherwise predisposed to commit the offenses. Although the instant matter is like *Bonner,* in that the defendant was induced by an informant to sell drugs to an undercover officer with the promise of sexual favors, unlike in *Bonner*, the record here readily supports the circuit court's finding that "defendant was predisposed to deliver controlled substances before he was induced to deliver to the undercover" officer.

¶ 42    Courts have identified several factors that are relevant in assessing predisposition in drug cases. They are: (1) the defendant's initial reluctance or willingness to commit the crime; (2) the

defendant's familiarity with drugs; (3) the defendant's willingness to accommodate the needs of drug users; (4) the defendant's willingness to profit from the offense; (5) the defendant's current or prior drug use; (6) the defendant's participation in cutting or testing the drugs; (7) the defendant's ready access to a supply of drugs; (8) the defendant's engagement in a course of conduct involving similar offenses; and (9) the defendant's subsequent activities. *Bonner*, 385 Ill. App. 3d at 146.

¶ 43    Applying these factors, and while viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found that the State rebutted defendant's entrapment defense beyond a reasonable doubt. Only the first identified factor in assessing predisposition, defendant's initial reluctance or willingness to commit the offense, favors him. In evaluating this factor, the circuit court explained that the recorded conversations between defendant and Tucker did not demonstrate any reluctance on defendant's part to commit the offense. Defendant correctly notes that the court's comments focus on the wrong timeframe. Again, predisposition involves an analysis of whether defendant was "ready and willing to commit the crime without persuasion and *before his or her initial exposure to government agents*." (Emphasis added.) *Id.* When defendant's interactions with Tucker were recorded by police, defendant already had extensive dealings with Trish, the confidential informant, who, as the circuit court found, induced defendant to commit the offenses.

¶ 44    Defendant's unrebutted testimony was that, beginning in April 2015, he and Trish got high together nearly every day, and she asked him to sell drugs to Tucker every time they were together. Defendant agreed to sell drugs to Tucker only after Trish offered to, and in fact did, have sex with him. Defendant's subsequent lack of reluctance to deliver controlled substances in the recorded conversations with Tucker—which all occurred after the inducement—were irrelevant to

defendant's predisposition to commit the offenses. See *Lewis*, 2020 IL App (2d) 170900, ¶¶ 38-39 (predisposition in the entrapment context is narrower than the common understanding of predisposition because it focuses on the period before defendant's initial exposure to government agents). This timeline demonstrates that the circuit court should have found this factor favored defendant, especially in light of the State's failure to call Trish as a witness. See *Bonner*, 385 Ill. App. 3d at 146 (defendant was not predisposed where, among other factors, he was initially unwilling to sell drugs but became willing only after the informant, who was not called to testify, initiated a sexual relationship with him).

¶ 45 The other factors, however, all weigh against defendant. Defendant's familiarity with drugs is apparent, as is his extensive history of drug use. On appeal, defendant concedes his familiarity with drugs and that he is addicted to them. He argues that the basis of his drug knowledge is his approximate 25-year use of drugs, such as heroin, cocaine, and cannabis, rather than a history of selling drugs. He notes that the defendant in *Bonner* was "an admitted addict," similar to the instant case, yet we still found the defendant in *Bonner* to not be predisposed. Here, while it is true that defendant testified to his long history of drug use, the recordings of the various drug transactions demonstrate that defendant was active in the narcotics trade for some time prior to meeting the informant. For example, in the May 25, 2015, recording, defendant lamented to Tucker that he intended to deliver six bags of heroin, but that the "girl" took two of them. Defendant stated that he did not "like that shit because I pay [her] for bringing me customers though. Don't take out of our customer's shit." Defendant complained to Tucker that "that's what I'm used to dealing with." Defendant also stated that he "gave her three fucking bags just for brining [Tucker] to me." Defendant told Tucker that he "was going to serve the bitch next door," meaning deliver drugs, but that Trish told him to never "serve that bitch again." Defendant's own

words, including the methods in which he acquires new "customers," what he was "used to dealing with," and that he was told to never serve Trish's neighbor *again*, readily demonstrate that he was previously engaged in a course of conduct involving similar offenses. Defendant also had knowledge of methods to evade police detection, in that he concealed the baggie containing heroin in his mouth before delivering it to Tucker on May 25, changed his phone number every two months, and boasted that the police "will never catch me."

¶ 46    Defendant likewise showed willingness to profit from the offenses. Upon his questioning at the police station, defendant stated that he obtains heroin for people who are sick, and, in the process, he makes "a little money" on the side, which he used to help support his own heroin habit. In contrast, in *Bonner*, there was no evidence that the defendant profited from any transactions other than keeping for himself some of the cocaine that he was supposed to give to the undercover officer. *Bonner*, 385 Ill. App. 3d at 147.

¶ 47    Defendant also accommodated the needs of Detective Tucker, who was posing as a drug user, repeatedly throughout the charged drug transactions. On the evening of May 22, 2015, after defendant handed Tucker a bag of heroin, defendant stated "[i]t's raw. It's always raw with me," which Tucker testified meant that the heroin was pure. As found by the circuit court, defendant complimented his product while denigrating the product of others, in that he told Tucker that he was "the only mother fucker out here with raw" and that "everybody else's shit is all shooken up." Defendant's statements are reasonably interpreted to mean that he was telling Tucker to only purchase drugs from him because he had superior product.

¶ 48    Defendant also accommodated Tucker's needs by initiating contact with him three days later, on May 25, to inquire whether he needed more heroin. Defendant confirmed that he had $100 worth of heroin for sale, and he also offered to sell Tucker "hard" for $50 per gram, which

Tucker testified meant crack cocaine, as well as "soft," meaning cocaine that is snorted. When Tucker commented that he should have brought more money and that defendant "had everything," defendant told Tucker that "all you gotta do is call me" and that he would "have it ready when you get here." He also told Tucker that he "never sleep[s]" and that Tucker could "come whenever the fuck you want." These comments also support the circuit court's finding that defendant had ready access to a supply of drugs, because defendant stated that he was able to accommodate a drug sale "whenever" Tucker needed, including during the overnight hours, because defendant "never sleep[s]." Defendant's access to a ready supply of drugs was confirmed by the fact that he was able to supply Tucker with drugs on at least three occasions within a six-day period. He never told Tucker that he was unable to deliver, and he never stated that he needed to check with a supplier to see if the drugs Tucker wanted were available. During the May 25 transaction, Tucker stated that he had "a hundo," and defendant replied, without hesitation, "ok, I got you." The only time defendant stated that he did not possess a particular kind of drug for sale was when Tucker asked if he had ecstasy. Defendant responded, "I don't got pills, but my guy got them." Importantly, defendant did not tell Tucker that he would acquire the pills from his supplier to deliver to Tucker, but he instead stated that he could "have 'em drop 'em off to you," which undercuts his argument that he was "just a middleman" tasked with couriering drugs and money between the buyer and seller. Additionally, on May 27, Tucker asked defendant, "How much hard for $200?" and defendant quickly replied, "I'll give you 4 gram." In contrast, in *Bonner*, the defendant had to "check on" whether he could obtain the drugs the undercover officer requested before nearly every transaction. *Id*. at 142-143.

¶ 49    Defendant argues that the May 27 transaction showed that delivering drugs to Tucker was not defendant's top priority because he was not at the meeting spot when Tucker arrived, he failed

to "cook up" the cocaine prior to their meeting, and he forgot that Tucker had requested four grams of cocaine instead of two. He compares these circumstances to *Bonner*, where we stated that the defendant showed "indifference [to the undercover officer's] business," and a "lack of discipline and devotion to the trade." *Id.* at 146-47. Defendant asserts that these circumstances "arguably show[] that [defendant] did not prioritize the drug sale." We view defendant's argument in this regard as a request to reweigh the evidence, which we decline to do. In addressing the question of the sufficiency of the evidence, it is not our role to reweigh the evidence. *People v. Hendricks*, 325 Ill. App. 3d 1097, 1110 (2001). Rather, the relevant question is whether, upon reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Day*, 279 Ill. App. 3d at 611. That the circuit court could have weighed the evidence differently or focused on some aspects of the transactions over others in analyzing defendant's predisposition does not support defendant's argument that it ruled irrationally.

¶ 50    The fundamental aspects of the May 27 transaction demonstrated defendant's willingness to accommodate Tucker's needs. When they met for the transaction, defendant handed Tucker a small bag of cocaine. Tucker questioned whether it was actually four grams, and defendant stated that he had forgotten that he wanted four grams and had given him just two grams by mistake. Tucker asked for $100 back, and defendant asked him if he wanted his money back or whether he wanted the other two grams. When Tucker inquired whether defendant actually had to two additional grams to sell him, defendant answered in the affirmative, told Tucker to hold the money and to wait there because he would return with the additional two grams. As found by the circuit court, defendant was willing to, and in fact did, make the amount right when Tucker complained that the delivery was light. Defendant was willing to remedy the problem, unlike the defendant in

*Bonner*, where he delivered a $100 bag of cocaine to the undercover officer even though he requested two $50 bags, and he told the officer to separate the bags himself. *Id.* at 142, 147.

¶ 51    Defendant testified that he never weighed or packaged the drugs that he sold to Tucker and that, when he went back to "the crib" to get the additional two grams for the May 27 transaction, it was his dealer who added more cocaine to the bag.  Even if the circuit court found defendant's testimony credible in this regard, defendant unequivocally offered to "go and cook this [powder cocaine] up" for Tucker, which demonstrated that defendant was ready and willing to prepare the drugs for sale.  Defendant would have done so had Tucker not told him that he would "take it soft" because he was in a rush.  As noted, defendant also stated that "[i]t's raw.  It's always raw with me," which demonstrates that defendant took pride in ensuring that the drugs he sold were of superior quality.  Defendant was also previously convicted of the same offense, albeit committed when he was 17 years old, and defendant possessed controlled substances at the time of his arrest, which shows that he had engaged in a course of conduct involving similar offenses and that his subsequent activities likewise involved controlled substances.  On balance, these factors weigh heavily against defendant, and we decline to disturb defendant's conviction in light of the overwhelming evidence of his predisposition to commit the offenses.

¶ 52                                B.  Class X Sentencing

¶ 53    Defendant next argues that the circuit court erred in sentencing him as a Class X offender for the Class 1 felony of unlawful delivery of a controlled substance pursuant to the recidivism provision in section 5-4.5-95(b) of the Unified Code (730 ILCS 5/5-4.5-95(b) (West 2016)).  He acknowledges that he failed to preserve this issue for appeal but argues that we should review the issue for plain error.  A reviewing court may review an unpreserved error in two circumstances:

"(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Stewart*, 2022 IL 126116, ¶ 11 (quoting *People v. Belknap*, 2014 IL 117094, ¶ 48).

We agree with defendant that we may reach the propriety of his Class X sentence, notwithstanding his failure to preserve the claim, under the second prong of the plain-error doctrine. *Stewart*, 2022 IL 126116, ¶ 12 (the imposition of an unauthorized sentence affects a defendant's substantial rights and is reviewable as second-prong plain error). We now turn to the merits.

¶ 54 When defendant committed the offenses, section 5-4.5-95(b) of the Unified Code provided:

"When a defendant, over the age of 21 years, is convicted of a Class 1 or Class 2 felony, after having twice been convicted in any state or federal court of an offense that contains the same elements as an offense now (the date the Class 1 or Class 2 felony was committed) classified in Illinois as a Class 2 or greater Class felony and those charges are separately brought and tried and arise out of different series of acts, that defendant shall be sentenced as a Class X offender. This subsection does not apply unless:

(1)     The first felony was committed after February 1, 1978 (the effective date of Public Act 80-1099);

(2)     The second felony was committed after conviction on the first; and

(3)     The third felony was committed after conviction on the second." *Id.*

¶ 55 Defendant argues that his Class 1 felony conviction in 1999 for unlawful delivery of a controlled substance did not qualify as a prior conviction for purposes of section 5-4.5-95(b) of

the Unified Code because he committed that offense when he was 17 years old. Pointing to amendments in the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq* (West 2016)), he maintains that, if he had committed that offense as a 17-year-old in May 2015 (the date of the instant offenses), the case would have proceeded through the juvenile court and resulted in a juvenile adjudication rather than a criminal conviction. See *People v. Williams*, 2021 IL App (1st) 191615, ¶ 25 (observing that the legislature amended the Juvenile Court Act in 2014 to provide that, with certain exceptions, no minor who was under the age of 18 at the time of the alleged offense may be prosecuted under Illinois' criminal laws); 705 ILCS 405/5-120 ("Except as provided in Sections 5-125, 5-130, 5-805, and 5-810 of this Article, no minor who was under 18 years of age at the time of the alleged offense may be prosecuted under the criminal laws of this State"). Defendant notes that, pursuant to our supreme court's holding in *People v. Taylor*, 221 Ill. 2d 157, 176-78, a juvenile adjudication is not a conviction under Illinois law. He argues that section 5-4.5-95(b) is "specifically limited *** to 'prior convictions,' " and that the legislature did not include prior juvenile adjudications as qualifying prior offenses. Thus, according to defendant, his 1999 conviction for unlawful delivery of a controlled substance is not an offense "now classified" (meaning May 2015, the date of the offenses) as a Class 2 or greater felony, such that it should not have been used as a predicate offense to make him subject to Class X sentencing under section 5-4.5-95(b). In support, defendant relies extensively on the First District's decision in *People v. Miles*, 2020 IL App (1st) 180736, ¶ 11, which directly supports his position. There, the First District held that a prior conviction is not a qualifying offense for Class X sentencing if those proceedings would have been resolved through juvenile delinquency proceedings if committed on the date of the present offense.

¶ 56    Conversely, the State relies on *People v. Reed*, 2020 IL App (4th) 180533, ¶ 25, where the

Fourth District expressly disagreed with *Miles* and held that a prior conviction of a juvenile in adult court is a qualifying offense for purposes of Class X sentencing. The State urges us to adopt the reasoning utilized in *Reed*, namely that: (1) juvenile courts do not have exclusive jurisdiction over juveniles, (2) section 5-4.5-95(b) did not suggest that criminal convictions imposed on minors should be considered juvenile adjudications, and (3) the *Miles* court's interpretation would require courts to examine the elements of the prior offense (as required in section 5-4.5-95(b)), as well as "the defendant's age when he committed the earlier offense, regardless of whether the defendant's age was an element of the offense." *Reed*, 2020 IL App (4th) 180533, ¶¶ 24-27.

¶ 57    Based on this split of authority, on our own motion, we entered an order on March 10, 2022, holding the instant appeal in abeyance pending the Illinois Supreme Court's decision in *People v. Stewart*, 2020 IL App (1st) 180014-U, which we anticipated would resolve the conflict. The supreme court entered its decision in *People v. Stewart*, 2022 IL 126116, on October 20, 2022, and it directly supports defendant's position.

¶ 58    In *Stewart*, the supreme court framed the issue as "whether the legislature intended a prior felony conviction to be a qualifying offense for Class X sentencing if the same offense would have resulted in a juvenile adjudication had it been committed on the date of the present offense." *Id.* ¶ 16. The court answered this question in the negative. It explained that "[l]egislation enacted after the appellate court rendered its conflicting decisions in *Miles* and *Reed* clarified that the General Assembly did not intend for convictions of juveniles in adult court to be considered qualifying offenses for Class X sentencing." *Id.* ¶ 18. In support, the court relied on the General Assembly's recent amendment of section 5-4.5-95(b) of the Unified Code by virtue of Public Act 101-652 (eff. July 1, 2021). Pertinently, the amendment added subpart (4) to section 5-4.5-95(b), which provides that the first qualifying offense for Class X sentencing must have been "committed

when the person was 21 years of age or older." *Id.* ¶ 19 (citing Pub. Act 101-652 (eff. July 1, 2021)). Based on the split of authority between the First and Fourth Districts, coupled with the "silence in the previous version of the statute on this issue," the *Stewart* court further determined that the amendment was intended to clarify the statute's original meaning, rather than effect a substantive change in the law. *Stewart*, 2022 IL 126116, ¶¶ 20-22.

¶ 59 In this case, the circuit court sentenced defendant as a Class X offender under section 5-4.5-95(b) of the Unified Code based on his two prior felony convictions—one of which was his Class 1 felony conviction in 1999 for delivery of a controlled substance. The presentence investigation report confirms that defendant committed that offense when he was a 17-year-old juvenile. Had he committed that offense in Illinois under the laws in effect in May 2015 (the date of the instant offense), it would have resulted in a juvenile adjudication rather than a Class 1 felony conviction, such that it is not "an offense now *** classified in Illinois as a Class 2 or greater" felony. Pursuant to *Stewart* (which effectively forecloses the State's reliance on *Reed*), defendant's 1999 conviction is not a qualifying offense for purposes of Class X sentencing—even under the previous version of section 5-4.5-95(b), and the court therefore erred in sentencing defendant as a Class X offender. We vacate defendant's Class X sentence and remand for resentencing as a Class 1 offender.

¶ 60                                  III. CONCLUSION

¶ 61 For the above stated reasons, we affirm defendant's convictions but vacate his sentence and remand the cause to the circuit court for resentencing.

¶ 62 Affirmed in part and vacated in part.

¶ 63 Cause remanded.