Filed 12/19/08          NO. 4-07-0970

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|      Plaintiff-Appellee, | ) | Circuit Court of |
|      v. | ) | Vermilion County |
| STEVEN COUCH, | ) | No. 05CF503 |
|      Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Claudia S. Anderson, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the opinion of the court:

In June 2007, a jury convicted defendant, Steven Couch, of (1) criminal drug conspiracy (count I) (720 ILCS 570/405.1 (West 2004)), (2) three counts of delivery of a controlled substance (15 grams or more but less than 100 grams of a substance containing cocaine) (counts II, IV, and V) (720 ILCS 570/401(a)(2)(A) (West 2004)), and (3) delivery of cannabis (more than 30 grams but not more than 500 grams of a substance containing cannabis) (count III) (720 ILCS 550/5(d) (West 2004)).

In September 2007, the trial court sentenced defendant to (1) concurrent prison terms of 26, 5, and 20 years on counts II, III, and V, respectively, and (2) 20 years in prison on count IV, to be served consecutively to his 26-year prison sentence on count II.

Defendant appeals, arguing that the trial court (1) erred by not instructing the jury on the affirmative defense of

entrapment and (2) abused its discretion by imposing consecutive sentences. We disagree and affirm.

### I. BACKGROUND

In August 2005, the State charged defendant with (1) criminal drug conspiracy (720 ILCS 570/405.1 (West 2004)), (2) three counts of delivery of a controlled substance (15 grams or more but less than 100 grams of a substance containing cocaine) (720 ILCS 570/401(a)(2)(A) (West 2004)), and (3) delivery of cannabis (more than 30 grams but not more than 500 grams of a substance containing cannabis) (720 ILCS 550/5(d) (West 2004)).

A summary of the evidence from defendant's May and June 2007 jury trial, which included testimony, in pertinent part, from (1) Illinois State Police Sergeant Earl Candler, (2) Anthony Shaeffer, and (3) defendant, showed the following.

Candler, an undercover officer assigned to task force six--a multijurisdictional task force implemented to combat narcotics trafficking--testified that he first met defendant on September 13, 2005, through Shaeffer, who was working as a confidential source for the task force. That same day, Candler, working in his undercover role as a drug purchaser, bought 88 grams of cannabis from defendant. (Defendant later pleaded guilty to delivery of cannabis, but that conviction is not the subject of this appeal.)

On September 16, 2004, Candler and Shaeffer picked up

defendant at his house and drove to a trailer owned by defendant's mother. Defendant went inside the trailer and called "Chuck" to arrange the delivery of cannabis and cocaine that Candler had earlier agreed to purchase from defendant.

Shortly thereafter, a car driven by Charles Allison arrived at the trailer. Surveillance from other task-force officers revealed that Allison drove defendant to Allison's home while Candler and Shaeffer remained outside the trailer. Allison and defendant returned to the trailer 20 minutes later. Defendant approached Candler and gave him 439.8 grams of cannabis and 26.1 grams of cocaine in exchange for $2,000. Defendant received $150 of the $2,000 purchase price as a "finder's fee" because he provided Candler the cannabis and cocaine. Candler stated that after the sale, defendant was upset that his fee was lower than he expected, which defendant attributed to an increase in Allison's drug prices. On the trip back to his house, defendant told Candler that he would introduce Candler to another drug supplier, who had previously provided defendant cannabis and cocaine.

On September 27, 2004, Candler and Shaeffer again traveled with defendant to his mother's trailer, where defendant tried unsuccessfully to contact Allison. The group then traveled to Allison's house and, after a private discussion between defendant and Allison, Candler drove Shaeffer and defendant back

to the trailer. Allison arrived shortly thereafter, picked up defendant, and drove defendant back to his house. A few minutes later, Allison and defendant returned to the trailer. Defendant approached Candler and gave him 53.7 grams of cocaine in exchange for $2,000. Defendant took a portion of the cocaine, valued at between $120 and $140, as his fee. During the trip to and from the trailer, the task force recorded defendant on audiotape telling Candler and Shaeffer that (1) Allison was his drug connection whom he had been working with for six years and (2) he had made thousands of dollars working with Allison.

On October 5, 2004, defendant sold an additional 51.6 grams of cocaine to Candler in exchange for $2,000. Candler stated that after the sale, defendant wanted Candler to meet Allison so that Candler could purchase drugs directly from Allison in case something happened to him. Later that month, defendant called Candler after he found out that Candler had purchased drugs directly from Allison without his assistance. Candler described defendant's demeanor on the phone as "extremely upset" because Candler had "cut him out of the deal."

Shaeffer testified that in 1997, he became a confidential source for a drug enforcement agency to resolve some "legal issues" he was facing. Shaeffer stopped working for the agency after he resolved his legal affairs but, sometime later, he returned to the agency to resume his role in that regard.

- 4 -

Shortly thereafter, Shaeffer became a confidential source for task force six because of his prior success in making "introductions." Shaeffer regarded his role as a confidential source as his primary employment. In exchange for Shaeffer introducing task-force members to drug suppliers, the task force provided him an income and free public housing.

In October 2003, Shaeffer first met defendant in the Champaign County jail, where they spoke about their respective abilities to acquire and deliver controlled substances. Defendant told Shaeffer that (1) he had distributed various types of drugs, including cannabis and cocaine, and (2) Shaeffer should contact him after Shaeffer's release from jail so that they could "hook up." Shaeffer stated that when he met defendant, he was not working as a confidential source for any law-enforcement agency.

In September 2004, Shaeffer attempted to contact defendant a "couple of times" to determine whether defendant would be willing to sell cannabis to Candler, whom Shaeffer identified as his partner. Shaeffer said that although he did not immediately make contact with defendant due to defendant's legal problems, he denied that it took "several" phone calls before he spoke with defendant. Shaeffer stated that his sole responsibility as a confidential source was to handle the introduction between Candler and defendant that "got the ball roll-

ing." Shaeffer testified that he did not (1) handle money or drugs, (2) participate in any negotiations between Candler and defendant, or (3) induce or coerce defendant into performing any acts that defendant was not already willing to accomplish. Shaeffer acknowledged that, in introducing defendant to Candler, he placed defendant in a position that later allowed the task force to apprehend defendant.

Defendant testified that when he met Shaeffer in jail, they discussed Shaeffer's involvement in the drug trade. Defendant embellished his claim that he was also involved in the drug trade so that he would have a "bigger fish story" than Shaeffer because it was what "people do in jail." Defendant stated that Shaeffer then asked for his phone number--which he provided--so that they could "hook up" after defendant was released from jail. However, defendant intended only to meet with Shaeffer socially and not "to hook up and do drugs."

Defendant stated that beginning in January 2004, he received repeated phone calls from Shaeffer, which he avoided. In August 2004, defendant spoke with Shaeffer, who asked him if he could get some cannabis. Shaeffer explained that he needed to make money because he was about to lose his apartment. Defendant responded that he did not have any cannabis, but that he needed "a couple of days to see what he could do." Defendant attributed his response to Shaeffer's inquiry to his own stupidity.

On September 13, 2004, defendant told Shaeffer that he would introduce Shaeffer to Allison but did not want to get involved in any drug sales. During the drug sale that occurred later that same day, defendant (1) handed Shaeffer the cannabis out of Candler's view and (2) refused to accept any money after Shaeffer delivered the cannabis to Candler. Defendant stated that (1) Shaeffer later gave him some proceeds from the drug sale and (2) he would not have involved himself in the drug sale if Shaeffer had not kept continually calling him.

Defendant admitted that he participated in several more drug transactions, which he attributed to pressure, money, and "a lot of things." Defendant explained that the pressure he felt was to produce "one fish story after another." Specifically, defendant surmised that Shaeffer was a big drug dealer and defendant wanted to introduce Shaeffer to a bigger drug dealer, which defendant admitted he had accomplished. Defendant stated that he (1) introduced people to drug dealers to support himself and (2) had purchased cannabis by the quarter-pound several times. Defendant testified that on October 5, 2004, he told Candler and Shaeffer that he did not want to participate in any more drug transactions because they knew how to contact Allison without his assistance.

Defendant admitted, however, that he (1) pleaded guilty to delivery of cannabis for the September 13, 2004, transaction;

(2) had purchased cannabis by the quarter-pound prior to September 13, 2004; (3) thanked Candler for the money he made on selling the cannabis on September 13, 2004; (4) liked the image, lifestyle, and money associated with being a "big-time" drug dealer; and (5) was not induced by Candler or Shaeffer to arrange drug deals with Allison. Defendant also admitted that he kept selling cannabis to Candler and Shaeffer after September 13, 2004, because he "felt obligated."

The jury later convicted defendant on all counts. At defendant's September 2007 sentencing hearing, the trial court considered defendant's presentence investigation report (PSI), which showed that defendant was 42 years old and had six prior felony convictions, with his first occurring 20 years earlier. Defendant's felony convictions included, in part, two aggravated battery convictions and two convictions for delivery of cannabis (more than 30 grams but not more than 500 grams of a substance containing cannabis), which included defendant's conviction for delivery of cannabis on September 13, 2004.

Before imposing sentence, the trial court stated the following:

> "It's clear to the [c]ourt that most of
> your adult life, your income has depend[ed]
> upon pursuits that would not be legal pur-
> suits. There's nothing that's enunciated

anywhere about any lawful employment that you've held in your adult life.  That does strike the [c]ourt.  I *** do think that the fact that you received compensation for the offenses that you commit are [sic] aggravating factors.  You do have a history *** of riding the same horse.  Popping up here *** are prior similar offenses.  To suggest that I not be concerned with the need to deter others *** really ignores what we do here.  It's extremely important in our community that peddlers of this particular trade are aware that they have a lot to risk, and that their risk would be more than money, it would be their liberty.

*** The amounts [of cocaine] that we had involved in this case are of grave concern, and a matter to be considered in your sentencing.  I think I've already referred to this, but the fact that you would appear to have no other means of support ***.  Much of this really relates to the sentences that I impose that are going to be consecutive, and those are going to be [c]ounts [II] and [IV].

The comments that I'm making are really set forth on the record for that purpose, so that I can try to impress upon the [a]ppellate [c]ourt my concerns with you, and with this case. With our community, and why I am sentencing as I am. I do note *** that you weren't charged based on an accumulative [sic] weight of more than 100 grams, which I think was a concession in the first place by the State.

It does strike me, and it did strike me previously, that even with the knowledge of what Allison was facing, you went forward with your trade in this particular case. I'm not sure if your remorse is for being caught, or that you truly have remorse. *** I do know that it's easy to--it's easy to find religion when you are really at the alter. I would suggest that that might be the circumstance here. I would give you the benefit of the doubt that you're sorry for the offense. But I do agree that your character, your history, the circumstances that surrounded the offenses committed here, that it is nec-

essary that I impose consecutive sentences in order to protect the public from further criminal conduct by you."

The court then sentenced defendant as previously stated. (At the State's request, the court did not impose a sentence on count I.)

This appeal followed.

## II. ANALYSIS

### A. The Trial Court's Refusal To Instruct the Jury on the Affirmative Defense of Entrapment

Defendant argues that the trial court erred by not instructing the jury on the affirmative defense of entrapment. We disagree.

Section 7-12 of the Criminal Code of 1961 states as follows:

"A person is not guilty of an offense if his or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this [s]ection is inapplicable if the person was pre-disposed to commit the offense and the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense." 720 ILCS 5/7-12 (West 2006).

"'Entrapment requires that a defendant show both that the State improperly induced him or her to commit a crime and that he or she was not otherwise predisposed to commit the offense.'" People v. Bonner, 385 Ill. App. 3d 141, 145, 895 N.E.2d 99, 103 (2008), quoting People v. Glenn, 363 Ill. App. 3d 170, 173, 842 N.E.2d 773, 776 (2006). "The entrapment defense is unavailable where the State has merely provided the defendant an opportunity to commit the crime." People v. Arndt, 351 Ill. App. 3d 505, 516, 814 N.E.2d 980, 991 (2004). Thus, a defendant's predisposition is the critical inquiry, and the State must show that the defendant was ready and willing to commit the crime in the absence of any persuasion by the State. Arndt, 351 Ill. App. 3d at 516, 814 N.E.2d at 991.

When deciding whether to give an instruction, the trial court must view the evidence in the light most favorable to the defendant. People v. Walker, 267 Ill. App. 3d 454, 459, 641 N.E.2d 965, 969 (1994). The instruction is justified even if only slight evidence is presented that, if believed, establishes the elements of the defense. People v. Cooper, 239 Ill. App. 3d 336, 351, 606 N.E.2d 705, 716 (1992). However, "[w]here the defendant was predisposed to sell the illegal substance and was motivated solely by profit, the trial court may properly refuse to instruct the jury on entrapment." People v. DeBeck, 204 Ill. App. 3d 15, 18, 561 N.E.2d 1081, 1084 (1990).

Although the State and defendant assert that this court's review is de novo, we disagree. In People v. Sims, 374 Ill. App. 3d 427, 871 N.E.2d 153 (2007), the Third District explained the appropriate standard of review as follows:

> "'[A] trial court's refusal to issue a specific jury instruction is reviewed under an abuse[-]of[-]discretion standard.' [Citations.] *** [O]ur supreme court in People v. Everette, 141 Ill. 2d 147, 565 N.E.2d 1295 (1990), stated that '[i]t is a matter of law whether the defendant has met the evidentiary minimum entitling him to instructions on an affirmative defense.' [Citation.] However, no court in Illinois has interpreted that statement as an intent by the supreme court to change the standard of review for jury instructions to a de novo standard. We therefore refuse to interpret it as such and adhere to the abuse[-]of[-]discretion standard for our review." Sims, 374 Ill. App. 3d at 431, 871 N.E.2d at 156-57.

See also People v. Douglas, 362 Ill. App. 3d 65, 76, 839 N.E.2d 1039, 1049 (2005); People v. Pinkney, 322 Ill. App. 3d 707, 720, 750 N.E.2d 673, 683 (2000) (rejecting similar arguments that this

- 13 -

court's review of a trial court's refusal to issue a jury instruction is <u>de</u> <u>novo</u>).  "'"Abuse of discretion" means clearly against logic; the question is not whether the appellate court agrees with the [trial] court, but whether the [trial] court acted arbitrarily, without employing conscientious judgment,'" or whether, considering all the circumstances, the court acted unreasonably and ignored recognized principles of law, which resulted in substantial prejudice.  <u>Long v. Mathew</u>, 336 Ill. App. 3d 595, 600, 783 N.E.2d 1076, 1080 (2003), quoting <u>State Farm Fire & Casualty Co. v. Leverton</u>, 314 Ill. App. 3d 1080, 1083, 732 N.E.2d 1094, 1096 (2000).

Our review of the evidence in this case reveals that the defendant did not meet his burden of presenting even slight evidence, which, if believed, would establish the elements of entrapment that would have entitled him to an instruction. Indeed, defendant's own testimony showed that he was predisposed to commit the drug sales.  Specifically, defendant admitted that (1) he had previously known Allison for six years and had made thousands of dollars working with him, (2) he was not induced by Shaeffer or Candler to arrange drug deals with Allison, and (3) he liked the image, lifestyle, and money associated with being a "big-time" drug dealer.

Moreover, when Shaeffer first met defendant in the Champaign County jail, Shaeffer was not working for any agency as

a confidential source.  Thus, Shaeffer could not--as an agent of the State--have improperly induced defendant.  See <u>People v. Gorski</u>, 144 Ill. App. 3d 284, 287-88, 494 N.E.2d 246, 249 (1986) (where the Second District declined to extend the defense of entrapment to include the conduct of a private party); see also <u>Bonner</u>, 385 Ill. App. 3d at 145, 895 N.E.2d at 104 ("[T]he inducement prong is met when the course of criminal conduct for which the defendant was convicted originated in the mind of a government agent who arbitrarily engaged in a relationship with the defendant and purposely encouraged its growth").

Thus, we reject defendant's argument that the trial court erred by not instructing the jury on the affirmative defense of entrapment.

B. The Trial Court's Imposition of Consecutive Sentences

Defendant also argues that the trial court abused its discretion by imposing consecutive sentences.  We disagree.

Section 5-8-4(b) of the Unified Code of Corrections provides as follows:

"Except in cases where consecutive sentences are mandated, the court shall impose concurrent sentences unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that consecutive

sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record."  730 ILCS 5/5-8-4(b) (West 2006).

"Because the trial court is in the best position to consider a defendant's credibility, demeanor, general moral character, mentality, social environment, and habits, the trial court's decision to impose consecutive, rather than concurrent, sentences for multiple crimes will not be reversed on appeal absent an abuse of discretion." People v. King, 384 Ill. App. 3d 601, 613, 892 N.E.2d 1196, 1206 (2008).

In this case, the trial court based its decision to impose consecutive sentences on (1) the seriousness of defendant's crimes, (2) defendant's extensive criminal history, (3) the large quantity of controlled substances defendant was able to supply, (4) defendant's lack of financial support other than the drug trade, (5) defendant's disregard for the law by continuing to engage in supplying controlled substances despite his knowledge of the legal penalties, (6) defendant's questionable character, and (7) its belief that consecutive sentences were necessary to protect the public from defendant's further criminal conduct.

Because the trial court (1) was in the best position to determine defendant's credibility, demeanor, and general moral

character and (2) articulated an appropriate basis for its determination, we conclude that the trial court did not abuse its discretion by imposing consecutive sentences.

III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT and TURNER, JJ., concur.