**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210530-U

Order filed March 17, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* O.H., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| a Minor | ) | Tazewell County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Appeal No. 3-21-0530 |
| | ) | Circuit No. 20-JA-141 |
| A.H., | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| N.H., | ) | The Honorable |
| | ) | Mark Gilles, |
| Intervenor-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices Brennan and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The trial court did not abuse its discretion by denying both a petition to intervene in the underlying proceedings and to restore visitation and a motion to reconsider when the petitioner forfeited her argument on the appeal of the request to

intervene and failed to provide sufficient evidence on the visitation issue to overcome the State's showing.

¶ 2    In this appeal, we consider whether the trial court properly denied a petition to intervene and restore visitation filed by a grandmother as the former caregiver of the infant. We also review the denial of the grandmother's motion to reconsider those denial orders. After examining the sufficiency of the petition to intervene and the parties' supporting evidence, we affirm both rulings.

¶ 3                                    I. BACKGROUND

¶ 4    In June 2020, a shelter care petition was filed in the circuit court of Tazewell County, alleging that newborn O.H. was neglected by her mother, A.H. (mother). A month later, petitioner N.H., mother of A.H. and grandmother of O.H. (grandmother), became the mother's adult guardian due to the mother's developmental disability and drug use. The mother's answer to the State's amended shelter care petition stipulated to count I, alleging neglect. In August 2020, the mother and the grandmother, as the mother's guardian, signed a final and irrevocable surrender of O.H., and the trial court entered the surrender order. A petition to terminate parental rights was subsequently filed.

¶ 5    A best interests hearing court report was filed, noting that the grandmother was O.H.'s relative caregiver and that her home was being visited twice each month. The caseworker reported that the grandmother was meeting O.H.'s basic needs for food, shelter, healthcare, and clothing and that her home provided a safe environment for the baby. The report concluded that O.H. was "developing well in the home and *** has a bond with her caregiver overall" before recommending that the mother's parental rights be terminated, with the Department of Children and Family Services (DCFS) retaining wardship with the right to place. The arraignment and adjudicatory orders were both entered on September 17, 2020, with the latter indicating that the

2

grandmother was present in court. A week later, the trial court terminated the mother's parental rights.

¶ 6        On February 2, 2021, O.H. was removed from the grandmother's custody after the grandmother, who had a history of methamphetamine abuse, tested positive for the drug. The grandmother subsequently retained private counsel, who filed an appearance for her as "grandmother and custodian of the minor child until removal." At O.H.'s permanency hearing in March, the caseworker stated that she was removed from the grandmother's care "[d]ue to safety reasons" after the grandmother's positive drug test. The caseworker reported O.H. had bonded well with her new caregivers, who were adequately meeting all of her needs.

¶ 7        The caseworker's report recounted the difficulties that had accompanied O.H.'s removal from the grandmother. The process took about an hour and a half, with the police present, because the grandmother was distraught and refused to turn over the child. The grandmother contended that the mother's parental rights had been signed over to her, not the State. She called the caseworker names, declared that the police would have to shoot her before she would allow O.H. to be removed, and threatened to kill herself because she could not live without the baby. Due to the grandmother's threat of suicide, Emergency Response Service was called to the scene. After the child was removed, the grandmother received a weekly two-hour supervised visit with her. The grandmother appealed the order directing O.H. to be removed from the home; that appeal is not at issue in this case.

¶ 8        The caseworker's report also stated the new caregivers had been directed to continue supplementing O.H.'s formula with cereal and to offer her more snacks because she remained underweight two weeks after the custody change. Because O.H. often struggled to use her right arm and sometimes appeared to "forget" about it, the new caregivers scheduled an appointment

3

to evaluate the need for additional services. The prospective service providers had attempted to contact the grandmother when O.H. was in her care, but they had not been able to reach her to schedule an appointment even after leaving messages.

¶ 9      On March 12, the trial judge entered a permanency order with the handwritten direction that the grandmother "shall not visit with the minor until further order of the court." The grandmother's counsel filed a handwritten petition to intervene the same day, alleging simply that the grandmother had been O.H.'s caregiver for her first eight months. In late May, the grandmother filed an amended petition to intervene and restore visitation. That petition alleged "the extremely strong maternal bond" between O.H. and the grandmother, noting that visitation had previously been deemed to be in the child's best interests. It described the grandmother's concerns about the care O.H. was receiving, asserting "that there was no cereal with the formula, when the baby was fed, that there were blisters, that there was no medicine for diaper rash, and that the baby had a rash which did not seem to be being addressed." Those concerns had prompted the grandmother to take photographs of the diaper rash and forward them to her counsel, over the caseworker's objection. The amended petition also alleged that visitation had been suspended without giving the grandmother an opportunity to appear and defend herself by presenting evidence. It asserted that reinstating visitation was in the best interests of O.H.

¶ 10      On June 24, a hearing was held on the amended petition. At that hearing, the grandmother's counsel chose to rely on the adequacy of the arguments in the petition and declined to present any additional argument or evidence. The State called the caseworker, who recounted the case facts. Initially, she had not been concerned about the care O.H. was receiving from the grandmother. She noted, however, that the grandmother failed to return calls from early

4

intervention specialists who left messages seeking to schedule an appointment to address the problem with the baby's right arm.

¶ 11        The caseworker also recounted the events surrounding O.H.'s removal. When the caseworker stated that the grandmother had threatened self-harm, the grandmother's counsel objected, asserting a lack of foundation. When the trial court inquired further, counsel stated that his concern was premised on the lack of testimony on the relevant date. The judge stated that the State still had a chance to establish foundation and overruled the objection. The State then asked the caseworker about the date of the grandmother's threat, and the latter indicated it occurred on February 2, the day O.H. was removed from the home. The caseworker added that the grandmother "said that she couldn't live without [O.H.] and that she was going to kill herself while the police were present in the home."

¶ 12        The caseworker also testified that the grandmother admitted having been addicted to methamphetamines but stated she was sober for about a year and a half before O.H. was born, although she had relapsed before the birth. When the State inquired about the results of the grandmother's routine drug test in February 2021, the caseworker indicated that she had seen the results and that they were positive for methamphetamines. The State followed up, asking if "there was anything noteworthy about that level," but the grandmother's counsel objected, requesting that the test result be introduced as best evidence. When the State expressed uncertainty about having the test result, the trial court overruled the objection; the caseworker stated that the results were "way above the threshold."

¶ 13        The grandmother insisted that the result was due to prescription medications she was taking, but the caseworker reported, over the grandmother's multiple objections, that she had learned from the toxicology lab that the medications would not cause a positive test result.

5

¶ 14 On cross-examination by the grandmother, the caseworker stated that she had no concerns about O.H.'s wellbeing during the eight months she was in the grandmother's care. The grandmother had been granted supervised visitation because it was initially believed to be in the best interests of O.H. due to the strong bond between them, however, the caseworker no longer held that belief at the time of the hearing. She had become concerned when the grandmother photographed a rash on O.H.'s private area and relayed the photographs to her counsel, over the caseworker's objection that it was "inappropriate."

¶ 15 The guardian *ad litem* (GAL) cross-examined the caseworker, eliciting testimony that the baby's rash was not severe. When asked about the grandmother's medications, the caseworker noted that they had been prescribed, but one had been prescribed by a prior physician in another town and it was unclear whether her current provider was aware of it. The GAL then asked about O.H.'s physical development and her right arm. The caseworker explained that her arm movement was improving and that she was gaining weight. The caseworker recommended that any visitation with the grandmother should be supervised.

¶ 16 During the parties' oral arguments, the grandmother reiterated the caseworker's findings that O.H. had been well cared-for while in her care and that the child had developed a strong bond with her. Counsel specified that they were currently seeking only the resumption of supervised visitation, which was in the minor's best interests. He argued that the grandmother had been concerned about the care O.H. received after her removal because she was not getting cereal in her formula as ordered and she had a rash and a runny nose during a visit. The grandmother had been keeping counsel "informed as an overprotective grandmother concerned about her granddaughter's care in someone else's hands" and wanted to resume visitation so she could maintain her relationship with the child.

¶ 17    In its argument, the State noted the grandmother's pleadings failed to include any statutory grounds for the request to intervene. It added that while a foster parent could automatically intervene after having custody for 12 months, the grandmother had custody for only 8 months. It contended that no other statutory grounds for intervention were present and that "in hindsight," problems had occurred during the time the grandmother had O.H., such as O.H. being consistently underweight and the grandmother failing to address the problem with her arm. The State was also "a little disturbed" that the grandmother persisted in photographing the baby after being told not to by the caseworker. The State reminded the court that the grandmother was a recovering methamphetamine addict who had tested positive for the drugs while caring for O.H. She had also threatened to commit suicide if O.H. were removed, prompting Emergency Response Services to be called. For those reasons, the State believed the grandmother was not a proper caregiver for a small child and requested that her amended petition be denied.

¶ 18    The GAL agreed with the State that the grandmother's pleading was defective because it failed to cite any legal basis. The GAL contended that O.H.'s stable placement with an older sibling should be a factor in a best-interests determination, along with the baby's improvements in weight and her evaluation for additional services. The GAL noted that babies often have minor diaper rashes at O.H.'s age and concluded that it was in the child's best interests to suspend visitation. If the grandmother's visits were to be reinstated, the GAL believed they should be supervised. The GAL also expressed concern about the grandmother's failure to "own up to" her drug use as shown by her continued denials in the face of positive test results.

¶ 19    In rebuttal, the grandmother's counsel argued that DCFS's decision to terminate visitation was just a secondary purpose of her petition because it forced her to seek restoration of visitation through legal means. Counsel indicated that the grandmother would agree to take

another drug test if visitation were resumed. In its oral ruling, the trial court denied the grandmother's amended petition, finding that a grant of the requested relief was not in the best interests of O.H.

¶ 20 The grandmother filed a motion to reconsider, arguing that she had a significant interest in the case as the grandmother and prior caregiver for O.H. She objected to the trial court's exclusive reliance on the caseworker's lay testimony about the drug test results, arguing that it was conclusory and prejudicial and that the State should have introduced the actual test results. The motion also alleged that the caseworker had undisclosed family ties to persons connected to the alleged abuse of O.H.'s mother, A.H. The motion to reconsider again did not cite any underlying statutory basis for the relief requested.

¶ 21 In response, the State argued that the grandmother had failed to satisfy her burden of proving the grounds for her motion. The trial court denied the grandmother's motion to reconsider, and she filed a timely notice of appeal.

¶ 22                                II. ANALYSIS

¶ 23 The court is charged with reviewing the propriety of the denial of the grandmother's motion to reconsider the trial court's prior rulings, which denied her amended petition to intervene in the proceedings and to restore visitation with O.H. Because a ruling on a petition to intervene is within the sound discretion of the trial court, it may be overturned only if it was an abuse of that discretion. *A & R Janitorial v. Pepper Construction Co.*, 2018 IL 123220, ¶ 26. Similarly, an order modifying visitation is also subject to review for an abuse of discretion. *In re Marriage of Adamson*, 2016 IL App (3d) 150105, ¶ 10 (citing *Heldebrandt v. Heldebrandt*, 251 Ill. App. 3d 950, 954 (1993)).

¶ 24    The grandmother now relies on the argument that she had a statutory right to receive notice of and to intervene in the underlying proceedings as the then-current relative caregiver of O.H, citing section 1-5(2)(a) of the Juvenile Court Act (705 ILCS 405/1-5(a) (West 2020)). That statutory basis, however, was raised for the first time on appeal, depriving the trial court of a timely opportunity to consider it, despite statements by the State and the GAL during the proceedings pointing out the petition's failure to cite any statutory grounds for intervening. Accordingly, the grandmother's newly added statutory argument was procedurally defaulted. See *In re M.H.*, 2020 IL App (3d) 190731, ¶ 15 (quoting *In the Matter of Chance H.*, 2019 IL App (1st) 180053, ¶ 45 (stating " '[t]o preserve an issue for appellate review, a party must, even in child custody cases, object at trial and file a written posttrial motion addressing it' ")). Because that argument forms the sole basis for her appeal from the denial of her amended petition to intervene, we affirm that denial.

¶ 25    The grandmother next argues that the evidence was insufficient to support the denial of her request to restore visitation. She asserts that the only evidence offered by the State was: (1) the grandmother's acts of photographing O.H.'s diaper rash and sending the photographs to her attorney over the caseworker's objection, and (2) the caseworker's unreliable and conclusory testimony about "sophisticated chemical test results and specific medications" taken by the grandmother that could have produced a false positive test for methamphetamines. At the hearing on that motion, the grandmother objected to the caseworker's testimony on the drug test results because: (1) it was hearsay; (2) the caseworker lacked the requisite qualifications and expertise to interpret and discuss those results, particularly in light of a possible interaction with the grandmother's prescribed medications; and (3) the State failed to provide the actual test results as

9

required by the best evidence rule. Thus, she concludes the trial court erred by overruling those objections and considering that evidence in its ruling.

¶ 26 In addition, the grandmother alleges that the caseworker improperly recommended the termination of visitation in retaliation for the grandmother's decision to document O.H.'s diaper rash and send the photographs to counsel, which the caseworker deemed to be "inappropriate." The grandmother contends that this recommendation was inconsistent with the caseworker's prior findings in the best interests hearing report filed with the trial court on September 14, 2020. In that report, the caseworker noted that O.H. "has a bond with her caregiver overall" and recommended maintaining O.H.'s placement with the grandmother after having conducted twice-monthly visits to the grandmother's home. The report unequivocally stated that the grandmother was meeting the baby's basic needs by providing adequate and appropriate food, clothing, and toys, and by maintaining a clean and safe "home environment that is conducive to healthy and age appropriate development," and ensuring that the baby received the proper vaccinations and medications.

¶ 27 As the petitioning party, the grandmother has the burden of proving the allegations in her petition to restore visitation. When reviewing a visitation order, we will only reverse if it is a clear abuse of the trial court's discretion. *Adamson*, 2016 IL App (3d) 150105, ¶ 10.

> " 'Abuse of discretion' means clearly against logic; the question is not whether the appellate court agrees with the [trial] court, but whether the [trial] court acted arbitrarily, without employing conscientious judgment, or whether, considering all the circumstances, the court acted unreasonably and ignored recognized principles of law, which resulted in

10

substantial prejudice." (Internal quotation marks omitted.) *People v. Couch*, 387 Ill. App. 3d 437, 444 (2008).

¶ 28    Although the parties' briefs extensively discuss the circumstances surrounding O.H.'s initial removal from the grandmother's custody, that issue is not currently before this court. The grandmother has filed a separate appeal from the removal order. The only issues before us in this case are whether the trial court abused its discretion by denying the grandmother's original request to restore her visitation rights and her subsequent motion to reconsider that ruling.

¶ 29    At the hearing on the grandmother's visitation request, her counsel chose to stand on the arguments presented in her amended petition and did not offer any additional evidence. The only evidence presented at the hearing was the testimony of the caseworker, the State's sole witness. She testified, over the grandmother's objection, that she had seen the results of the drug test, and described them as "way above the threshold." She also reported that the toxicology lab had informed her that the grandmother's prescribed medications would not produce a false positive result for methamphetamines.

¶ 30    Before this court, the grandmother argues that the caseworker's testimony was improper because: (1) she was not qualified to testify about lab test results; (2) her testimony was inadmissible hearsay; and (3) the actual test results should have been admitted under the best evidence rule. We need not address those arguments, however, because even if the evidence objected to at the hearing had been excluded, the denial of the grandmother's amended petition to restore visitation was not an abuse of the trial court's discretion.

¶ 31    Without objection, the caseworker testified that the grandmother had reported her prior addiction to methamphetamines and stated that she had been sober for one-and-a-half years, although admitting she had relapsed before O.H.'s birth. The grandmother also did not object

11

when the caseworker first expressly stated that the grandmother's February 2021 drug test was positive for methamphetamine. The caseworker also described the grandmother's actions when informed of the test results and the decision to remove O.H. She explained that the grandmother denied any illegal drug use and vehemently resisted O.H.'s removal, refusing to turn over the child. She also threatened to kill herself, stating she could not live without the baby, causing Emergency Response Services to be called to the home.

¶ 32 Because the grandmother did not object to that testimony, any argument on appeal asserting its impropriety is forfeited. Although the plain error doctrine may create a narrow exception to the forfeiture doctrine, plain error has not been raised here. See *In re Z.J.*, 2020 IL App (2d) 190824, ¶¶ 50-51 (explaining the application of forfeiture and the plain error exception); *In re L.B.*, 2015 IL App (3d) 150023, ¶ 11 (stating "[h]owever, since termination of parental rights affects a fundamental liberty interest, we will consider the issue for plain error"). Accordingly, we will consider that portion of the caseworker's testimony.

¶ 33 Because the grandmother offered no evidence at the hearing, our review of whether the trial court's denial of the grandmother's request to restore visitation was an abuse of discretion is limited to the parties' arguments and the portion of the caseworker's testimony that was not objected to at the hearing, The record shows that the grandmother was initially found to have had provided an appropriate home for O.H. for about eight months. The evidence reveals, however, that O.H. continued to be underweight while living with the grandmother and no arrangements had been made to have O.H.'s right arm function assessed, despite repeated calls and messages from the relevant service providers.

¶ 34 O.H. was removed from the home when the caseworker learned that the grandmother, who was a recovering methamphetamine addict, tested positive for that drug during a routine

drug drop in February 2021. The caseworker also knew that the grandmother had only recently attained sobriety and had admitted to relapsing before O.H.'s birth.

¶ 35   Moreover, when DCFS attempted to remove O.H. from the grandmother's care, she refused to turn the baby over and threatened to inflict serious self-harm, causing the police and Emergency Response Services to be called. During a later supervised visit with O.H., the grandmother ignored the caseworker's express directions and took photographs of the baby's diaper rash that she then relayed to her counsel. The caseworker testified that the diaper rash was not severe.

¶ 36   After carefully examining the evidence, we conclude that it fails to support the conclusion that the trial court abused its discretion in denying the grandmother's request to restore visitation. In making its ruling, the trial court did not "act[] arbitrarily, without employing conscientious judgment" nor did it, "considering all the circumstances, [act] unreasonably and ignore[] recognized principles of law, which resulted in substantial prejudice." (Internal quotation marks omitted.) *Couch*, 387 Ill. App. 3d 437, 444 (2008).

¶ 37   Finally, we turn to the propriety of the order denying the grandmother's motion to reconsider the denial of her amended petition. Our review of that motion reveals that it merely reiterated the arguments contained in her original petition, asserting that the only evidence supporting the termination of visitation was the caseworker's unqualified and conclusory testimony about the drug test results. At the hearing, her counsel noted that she had raised O.H. for nine months and, as a loving grandmother, wished to maintain contact with her through visitation.

¶ 38    The State countered that those arguments were insufficient to support the motion to reconsider, and the GAL concurred with the State's assessment, adding that the evidence provided at the original hearing was sufficient to support the original termination of visitation.

¶ 39    While we ultimately agree with the State that this decision must be affirmed, it is possible, as the grandmother argues, that the State's objections to restoring visitation could have been cured by granting her supervised visitation subject to specific conditions imposed by the trial court. Our review of the trial court's decision, however, is limited to assessing, *not* whether there might be another reasonable conclusion, but whether a different conclusion is so clearly required by the facts and the law that the trial court's contrary decision constitutes an abuse of its discretion. We cannot say that it does.

¶ 40    We find no evidence in the record that the trial court did not know and understand the applicable law. Nor do we find any evidence that the judge misstated or misunderstood the facts that had been presented to him. Further, the court had multiple opportunities, unavailable to us on a written record, to observe the demeanor and assess the credibility of all the witnesses. The record shows that the court applied the correct law to accurate facts and to its own personal assessments of the parties and arrived at a decision that the grandmother, wholly understandably, did not agree with and was unwilling to accept.

¶ 41    In both her motion to reconsider and her argument at the hearing, the grandmother merely restated the contentions in her amended petition. She did not assert that the trial court misstated the applicable law or made any other legal errors. Nor did she suggest that the court misstated or misunderstood the evidence. She simply contended that the judge made the wrong decision, without offering any new substantive rationale supporting the opposite conclusion. Accordingly,

14

we cannot say that the trial court abused its discretion in denying the grandmother's motion to reconsider.

¶ 42                                III. CONCLUSION

¶ 43        For the foregoing reasons, we affirm the judgment of the circuit court of Tazewell County.

¶ 44        Affirmed.